**STATE of Missouri, Plaintiff–Respondent,**

v.

**Jessie R. CARTER, Defendant–Appellant.**

**No. 23959.**

Missouri Court of Appeals, Southern District, Division Two.

March 28, 2002.

See also 50 S.W.3d 251.

Jennifer S. Walsh, Asst. Public Defender, St. Louis, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Linda Lemke, Asst. Atty. Gen., Jefferson City, for Respondent.

NANCY STEFFEN RAHMEYER, Judge.

Following a jury trial, Jessie R. Carter ("Defendant") was convicted on three counts of first degree murder under § 565.020.[1] On appeal, Defendant alleges that the trial court erred when it denied his request for a mistrial following a series of questions from the prosecutor on cross-examination regarding whether the knife wound on one of the victims was smaller because it had been inflicted with Defendant's knife rather than the knife of a co-defendant, Mark Christeson ("Christeson"). Defendant charges that the state was thereby allowed to present two different theories as to who had cut the victim's throat, endorsing Defendant's testimony at Christeson's earlier trial that Christeson had committed the act, but arguing at Defendant's trial that he had done so. While we agree that the prosecutor did attempt to change the theory of the case with respect to this victim, no prejudicial error resulted and we affirm.

Defendant does not challenge the sufficiency of the evidence to sustain the jury verdicts. The facts viewed in the light most favorable to the verdicts reveal that on February 1, 1998, Defendant and Christeson, who are cousins, went to the home of Susan Brouk ("Susan")[2] to implement a plan for them to steal her Bronco and for Christeson to have sex with her. Christeson had previously attempted to introduce himself to Susan, but had been asked to leave her property and he wanted to "have his little fun with [her] and knock some crap out of her."

Defendant and Christeson walked the quarter-mile to Susan's trailer house, carrying shotguns, knives, shoelaces, nylon rope, and gloves. Once inside, Defendant used the rope and shoelaces to tie up Susan and her two children, Adrian and Kyle, ages twelve and nine, respectively. Christeson then instructed Susan to get up and Defendant cut the shoelaces tied around her feet with a knife, which was somewhat larger than a pocketknife and had a dull blade. After Christeson and Susan returned from the bedroom, Susan said, "You had your fun. Now get out."

---

1. All statutory references are to RSMo 2000, unless otherwise indicated.

2. Since all of the victims have the same last name, we will refer to them by their first names in this opinion. We mean no disrespect.

Then Adrian recognized Defendant and said his name out loud. At this, Christeson motioned Defendant into the kitchen and said, "We got to get rid of them."

Christeson and Defendant then loaded Susan, Adrian, and Kyle into the Bronco, as well as several items from the house including the television, stereo, VCR, and a checkbook. They drove to a wooded area near a pond and parked by the driveway that led to the home where Christeson and Defendant lived with their uncle. After Defendant had taken the Brouk family out of the Bronco, Christeson approached Susan, kicked her to the ground, and slashed her throat twice with a bone-cut knife, a knife that Defendant described as having a four to six inch blade, which was two or three inches longer than Defendant's knife.

Christeson then asked Defendant to cut Kyle's throat, but Defendant refused, and Christeson instructed him to retrieve some cinder blocks. When Defendant returned with a block, he noticed Christeson had cut Kyle's throat. Although Defendant testified that he refused to hold Kyle's feet while Christeson held his head under water, Defendant also gave a statement to the police in which he indicated that he did hold Kyle's feet. As Defendant was retrieving another block, he heard a gunshot and turned to see Christeson aiming at the pond. Christeson then choked and drowned Adrian while Defendant held her feet. Christeson and Defendant then grabbed Susan, who was still alive, but had lost a lot of blood and was grasping for air, and threw her into the pond.

After packing personal items, Defendant and Christeson left in the Bronco, and eventually headed west on Interstate 44 toward Blythe, California. Along the way, they sold some of their and Susan's property, and on at least two occasions, Defendant had the opportunity to speak with law enforcement officials without Christeson

hearing, but Defendant never attempted to leave the situation or inform police of what had occurred. Defendant and Christeson were arrested in California on February 9, 1998.

In a separate trial, Christeson was convicted of three counts of first degree murder and sentenced to death. *State v. Christeson*, 50 S.W.3d 251, 257 (Mo. banc 2001), *cert. denied*, —— U.S. ——, 122 S.Ct. 406, 151 L.Ed.2d 309 (2001). Defendant was called to testify at Christeson's trial and his testimony included a statement that Kyle's neck was cut while Defendant was retrieving a cinder block. During his opening statement at Defendant's trial, the prosecutor noted that the state's evidence would show that when Defendant returned from retrieving the block, "Christeson had already sliced Kyle Brouk's throat." However, during the state's cross examination of Defendant, the following exchange occurred:

Q [Prosecutor]: Did you see Kyle Brouk's neck after it was cut?

A [Defendant]: After, yeah.

Q All right. But you didn't do that.

A No.

Q And those wounds didn't bleed a whole lot, did they?

A Not much I seen.

Q All right. In fact, they weren't very deep, were they?

A I didn't see—see it too well.

Q Um-hum. Well, isn't it a fact, sir, that those wounds were much smaller than the wounds to Susan Brouk, weren't they?

A A little bit.

Q Um-hum. In fact, they were smaller because they were inflicted by a smaller knife, weren't they?

A No, not really.

**Q** In fact, they were smaller because they were inflicted by your knife, weren't they?

**A** No.

At this time, Defendant's counsel requested a mistrial alleging that the state had endorsed Defendant's testimony at Christeson's trial that Christeson had cut Kyle's neck, but now was changing the "theory of the case in this manner to try to suggest that [Defendant] cut the throat of Kyle Brouk." The trial court denied the request.

During closing arguments, the prosecutor highlighted Defendant's testimony that after retrieving the block, he "came back to find Kyle's throat cut." The prosecutor also argued that whether Defendant had held Kyle's feet during his drowning was not of issue, given Defendant's other participation, aid, and encouragement in his murder. The case was submitted to the jury with instructions based on the theory of accomplice liability. The jury found Defendant guilty on all three counts of first degree murder, and the trial court sentenced him to three consecutive life sentences, without the possibility of probation or parole.

Defendant's sole point on appeal is that the trial court erred in denying his request for a mistrial following the prosecutor's questions regarding whether Kyle's knife wound was smaller because it had been inflicted by Defendant's knife. Defendant charges that the state was allowed to change the theory regarding who had cut Kyle's throat, endorsing Defendant's testimony at Christeson's earlier trial that Christeson had committed the act, but arguing at Defendant's trial that he had done so. This action, according to Defendant, violated his rights to due process and a fair trial, and he asks that we remand for a new trial.

"The granting of a mistrial is a drastic remedy that should be used only when necessary to cure grievous prejudice, and in extraordinary circumstances where the prejudice to the defendant cannot be removed by other means." *State v. Cunningham*, 32 S.W.3d 217, 219 (Mo.App. S.D.2000). A trial court's decision to deny a request for a mistrial will only be overturned upon a finding that the trial court abused its discretion. *Id.* "Judicial discretion is deemed abused only when a trial court's ruling is clearly against the logic of the circumstances then before it and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *State v. Neff*, 978 S.W.2d 341, 345 (Mo. banc 1998).

Under most circumstances, a "trial court acts within its discretion and cures error in the admission of evidence by withdrawing the improper evidence and instructing the jury to disregard it, rather than declaring a mistrial." *State v. Thurlo*, 830 S.W.2d 891, 893 (Mo.App. S.D. 1992). Further, "[t]he fact that the defendant sought no relief other than a mistrial cannot aid him." *State v. Smith*, 934 S.W.2d 318, 321 (Mo.App. W.D.1996). Where a defendant does not ask for an instruction to the jury, "we will consider the failure to grant a mistrial an abuse of discretion only if we find that the reference was so prejudicial that its effect could not have been removed by direction to the jury." *Id.* (internal quotations omitted).

"[T]he State is not collaterally estopped from taking inconsistent positions." *State v. Nunley*, 923 S.W.2d 911, 926 (Mo. banc 1996). Nor is there a "rule requiring the state to argue mirror-image theories in the separate prosecutions of co-perpetrators." *State v. Nicklasson*, 967 S.W.2d 596, 621 (Mo. banc 1998). However, in a federal habeas case following convictions on first degree murder charges, which

were affirmed by the Missouri appellate court, the Eighth Circuit held that while it is not necessary for the state to "present precisely the same evidence and theories in trials for different defendants[,] . . . . the use of inherently factually contradictory theories violates the principles of due process." *Smith v. Groose,* 205 F.3d 1045, 1048, 1052 (8th Cir.2000).

■ The Eighth Circuit analysis, which we find useful to our determination in this case, considers the presence of two factors. First, Defendant "must show that the impropriety was so egregious that it fatally infected the proceedings and rendered the entire trial fundamentally unfair." *Id.* at 1049. (internal quotations omitted). Second, the burden is on Defendant to "demonstrate a reasonable probability that the error complained of affected the outcome of the trial, meaning that the verdict probably would have been different absent the alleged impropriety." *Id.* (internal quotations omitted).

■ Before addressing the two factors in the instant case, we note that the state argues that the prosecutor was not attempting to change the theory regarding who had cut Kyle's throat by the line of questioning. Instead, the state claims that its only intention was to impeach Defendant's credibility. However, given that it had been clearly established at Christeson's trial that Christeson had slit Kyle's throat, a fact to which the prosecutor also had alluded in both the opening and closing statements at Defendant's trial, we must disagree with the state's assertion. Borrowing from the Eighth Circuit, the theory presented at Christeson's trial that Christeson had cut Kyle's throat and the theory presented mid-stream at Defendant's trial that Defendant had cut his throat are simply two "inherently factually contradictory theories." *Id.* at 1052. However, we must proceed with the remainder of the analysis to determine whether prejudicial error occurred due to the state's attempt to change the theory and the trial court's subsequent denial of Defendant's request for a mistrial due to that change in theory.

■ Under the first factor, we find that the line of questioning was so isolated and represented an anomaly when compared to the remainder of the trial. There was no other reference made to the theory, and the prosecutor in both opening and closing statements went back to the original theory that Christeson had cut Kyle's throat. Therefore, any error caused by the state's attempt to change theories did not "fatally [infect] the proceedings and [render] [the] entire trial fundamentally unfair." *Id.* at 1049.

■ Under the second factor, we must consider whether, absent the offending line of questions, there is a reasonable probability that the outcome or verdict would have been different. *Id.* The state presented the case to the jury based on the theory of accomplice liability. The elements of first degree murder include "(1) knowingly (2) causing the death of another person (3) after deliberation upon the matter." *State v. Salazar,* 978 S.W.2d 469, 470 (Mo.App. S.D.1998). In a first degree murder case premised on accomplice liability, the jury must also find that the defendant deliberated on the act. *Id.* It is not enough that the person who actually caused the death to have deliberated on the act; the instruction to the jury *"must ascribe deliberation to the defendant." State v. O'Brien,* 857 S.W.2d 212, 217 (Mo. banc 1993). Further, in a case based on the accomplice theory of liability, "the jury *must also find that the defendant had a purpose to aid another in the commission of the crime."* *Id.*

Here, disregarding the prosecutor's questions on the second theory that Defendant cut Kyle's throat, there was ample evidence on which to find Defendant guilty of Kyle's murder, as well as Susan's and Adrian's, based on the theory of accomplice liability. The only evidence that may have refuted Defendant's deliberation was in connection with Susan's murder, where Defendant claimed that he was not aware that the Brouk family was going to be killed until after Susan's throat was cut; however, Defendant admitted to helping Christeson throw Susan into the pond and that she was still breathing at that point. Although Defendant gave conflicting statements as to whether he held Kyle's feet while Christeson held his head under water, all other evidence pointed to a level of participation, aid, and encouragement appropriate for conviction based on the accomplice liability theory. Point denied.

The judgment is affirmed.

GARRISON, P.J., and PARRISH, J., concur.