STATE of Missouri, Plaintiff–Respondent,

v.

Willekis Bakari DORSEY, Defendant–Appellant,

No. 25867.

Missouri Court of Appeals, Southern District, Division Two.

Feb. 22, 2005.

George W. Gilmore, Jr., Sikeston, MO, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Lisa M. Kennedy, Asst. Atty. Gen., Jefferson City, MO, for Respondent.

JEFFREY W. BATES, Chief Judge.

A jury found Willekis Dorsey ("Defendant") guilty of first degree murder and armed criminal action. *See* § 565.020.1; § 571.015.[1] The trial court sentenced Defendant to concurrent terms of life imprisonment without parole and eight-years imprisonment, respectively. Defendant appeals, presenting four points for decision. The first three points challenge evidentiary rulings by the trial court; the fourth point seeks plain error review of statements made during the State's closing argument. Defendant also filed a motion requesting this Court to remand the case so Defendant can file another motion for new trial based on newly-discovered evidence. We deny the motion to remand and affirm Defendant's convictions.

Defendant does not challenge the sufficiency of the evidence to sustain his convictions. In this appeal, we consider the facts and all reasonable inferences derived therefrom in a light most favorable to the verdict, and we reject all contrary evidence and inferences. *State v. Cravens,* 132 S.W.3d 919, 921 (Mo.App.2004); *State v. Campbell,* 122 S.W.3d 736, 737 (Mo.App. 2004). Viewed from that perspective, the favorable evidence supporting the State's case against Defendant is set out below.

Defendant, Earl Brown ("Brown"), Hershal Wiley ("Wiley"), Tyrone Sheron ("Tyrone") and Michael Sheron ("Michael") had been acquainted with one another since elementary school.[2] In the summer of 1999, Brown was 15; Defendant was 17 or 18; Wiley was 17; Tyrone was 21 or 22; and Michael was 25. Brown was the only one of the group who had attended school during the 1998–99 term, but he dropped out after the school year was completed. During the summer of 1999, he began to spend time with Defendant and "started running the streets." Defendant, Brown, Wiley, Tyrone and Michael "[s]tarted running around and selling drugs." Tyrone supplied the drugs that the others sold.

May 28, 2000 was a Sunday. That evening, Defendant and Brown returned to Sikeston, Missouri, after spending the Memorial Day weekend in Memphis, Tennessee, with three girls. Defendant and Brown went looking for Michael and found him at a local mini-mart. Michael was standing beside a Lexus automobile owned by Don Prude ("Victim"). Victim was a drug dealer from Blytheville, Arkansas. Michael and Victim were talking. When Defendant and Brown arrived, Defendant got out of his vehicle and also spoke to

**1.** All references to statutes are to RSMo (2000).

**2.** The use in some instances of given names, rather than surnames, is for the sake of clarity; no disrespect is intended.

Victim. Victim left, and Michael and Defendant talked for a little while. Everyone then left the mini-mart parking lot.

Later that evening, Defendant and Brown met Michael at his house and went for a ride together. Michael said he had gotten 4.5 ounces of crack cocaine from Victim and did not want to give it back.

On Monday, May 29th, Defendant and Brown went riding around together. During the ride, Defendant asked Brown if he wanted to make some money by participating in killing Victim and keeping his drugs. Brown said he would. Victim came to the home of Tyrone's mother that day while Defendant and Brown were there. Victim tried to purchase marijuana from Defendant.

Later that evening, Defendant and Brown went to a meeting at Michael's house. Six persons were present for this meeting: Defendant, Brown, Michael, Tyrone, Reggie Wilkens, and Sean Clay. Michael said he had Victim's drugs and he wanted to keep them, so they needed to kill Victim. He offered all of the others a chance to participate in the murder in exchange for some of the drugs. Defendant said he would kill Victim, and Michael gave Defendant a 9mm Beretta Model 92FS handgun to use for that purpose. This firearm, which had been stolen a few months earlier, was a special model with very distinctive and unusual features. The gun had the seals of different branches of the military on the slide, and the hammer, trigger and screws were gold-colored. The plan was simply to kill Victim when he came to pick up his drugs. The drugs were divided that evening between Brown, Defendant, Michael and Sean Clay. Defendant received 1.5 ounces of Victim's crack cocaine for agreeing to kill him.

After the meeting, Defendant and Brown went outside to wait for Victim. When he arrived, however, he had a girl in the car with him. Defendant and Brown did not carry out the murder then because the girl was present. Defendant and Brown went back inside the house, and the group discussed killing Victim the next day. The new plan was for Brown to lure Victim to Haywood City, Missouri. Defendant and Wiley were going to follow Victim and kill him there. Michael and Tyrone said they needed Wiley to drive because he was the only one of the group who had a driver's license.

On May 30, 2000, Defendant and Brown went to Wiley's house. Defendant explained the plan and told Wiley that all he had to do was drive. He agreed to do so. The three of them drove into Sikeston and sat in a car waiting for Victim to show up. When he did, Defendant told Victim that Brown was a cousin of Michael and Tyrone and would take Victim to his drugs. Brown got in Victim's car and directed Victim to the home of Brown's grandmother, Clara Adams. She lived on Hickory Street in Haywood City. Defendant and Wiley were familiar with the area, and Wiley knew the location of Adams' house.

Once Brown and Victim arrived in Haywood City, they drove to Hickory Street. Brown had Victim drive around the block once to give Defendant and Wiley time to get into position. After circling the block, Brown had Victim stop in front of Adams' house. Brown told Victim the drugs were behind the house. Brown got out of the car and went behind the residence to stall for time while Victim waited in his car. Brown saw Defendant and Wiley drive past, turn around and come back. Wiley stopped his car beside Victim's car. Defendant got out, opened the passenger door of Victim's car, said "I've got your drugs" and then pulled out the 9mm Beretta and fired four shots at Victim. One bullet struck him in the back of the head, killing him. Defendant then wiped the

gun off, threw it away and got back in Wiley's car. Meanwhile, Brown ran down a pathway by his grandmother's house and rejoined Defendant and Wiley at another location farther down Hickory Street. After Brown got back in Wiley's car, the three of them returned to Sikeston.

Police arrived to investigate the murder about 15 minutes after it occurred. Two witnesses reported seeing Defendant and Wiley on Hickory Street a few minutes before, and again immediately after, the murder occurred.

Defendant was arrested about two hours after Victim was killed. During a voluntary interview with the police, Defendant admitted that he and Wiley had been in Haywood City and that, around the time Victim was killed, Defendant and Wiley had driven past Victim's Lexus twice while the vehicle was parked on Hickory street. Defendant denied that he was involved in the killing or that he had recently fired a gun. He agreed to submit to a gunshot residue test, which showed that Defendant's hand tested positive for gunshot residue.

On September 4, 2000, some children found a handgun under an abandoned automobile near the location of the murder. The gun was retrieved by a Mr. Hogan, who took it to the police because he thought it might have been used in the homicide. The weapon Hogan gave to the authorities was a 9mm Beretta Model 92FS. The gun had military insignia on the slide, and the hammer, trigger and screws were gold-colored. Ballistics tests showed Victim was killed with this gun.

After Defendant was convicted and sentenced, he appealed. Additional facts are provided below when relevant to our discussion of Defendant's motion for remand and his four points relied on.

## Motion for Remand

The first issue we address is Defendant's motion for remand based upon newly-discovered evidence. The motion arises from the following events.

At Defendant's trial, Brown testified for the State. He had originally been charged with Victim's murder, but the State offered to reduce Brown's charge to conspiracy to murder, with a punishment range of 5–15 years, in exchange for his testimony against Defendant, Wiley, Tyrone and Michael.[3] Before Defendant's trial took place, Brown had testified at the earlier trials of Wiley and Tyrone. In all three trials, Brown consistently identified Defendant as the person who shot and killed Victim.[4]

Defendant was convicted of first degree murder and armed criminal action on August 7, 2003. His motion for new trial was filed on September 2, 2003 within the 25–day time period granted by the trial court. Defendant's request for a new trial was denied on September 24, 2003, at which time the sentences were pronounced and judgment was entered.

On July 12, 2004, Brown executed an affidavit stating Tyrone was the person who actually killed Victim. Brown claimed his testimony about seeing Defendant shoot Victim had been coerced by Scott County police officers. On August 3, 2004, Defendant's counsel took a sworn statement from Brown to obtain additional information concerning his recantation.

---

3. Wiley, Tyrone and Michael had all been charged with Victim's murder based on testimony given by Brown at their preliminary hearings.

4. Wiley and Tyrone were both acquitted at their trials.

On September 24, 2004, Defendant filed a motion requesting this Court to remand the case to the trial court to permit the filing of another motion for new trial based on the newly-discovered evidence contained in Brown's affidavit and sworn statement. Copies of these documents were attached to the motion. The motion alleged that a remand should be ordered because Brown's recantation completely exonerates Defendant of the crimes of murder and armed criminal action. We ordered the motion taken with the case.

■■■ Brown's recantation was not presented to the trial court in Defendant's motion for new trial because the change in Brown's testimony did not become known until after the time for filing and/or amending the motion had expired. Therefore, the affidavit and sworn statement have been submitted to this Court for consideration. "Generally, presentment of evidence extraneous to the trial court record should not be considered on appeal." *Benton v. State,* 128 S.W.3d 901, 904 (Mo.App. 2004). Nevertheless, "an appellate court has the inherent power to prevent miscarriage of justice or manifest injustice by remanding a case to the trial court for consideration of newly discovered evidence presented for the first time on appeal." *Id.; State v. Ramsey,* 874 S.W.2d 414, 417 (Mo.App.1994). Whether to exercise the inherent power to remand for this purpose, in order to prevent a miscarriage of justice in such unique cases, is discretionary with the appellate court. *McCauley v. State,* 866 S.W.2d 892, 894 (Mo.App.1993); *State v. Davis,* 698 S.W.2d 600, 603 (Mo.App. 1985). This remedy, however, is limited to those extraordinary cases in which the newly-discovered evidence completely exonerates the defendant of the crime for which he or she was charged. *State v. Gray,* 24 S.W.3d 204, 209 (Mo.App.2000); *State v. Bransford,* 920 S.W.2d 937, 949 (Mo.App.1996).

■■■ We decline to remand this case because Brown's affidavit and sworn statement do not completely exonerate Defendant of the crimes of first degree murder and armed criminal action. While Brown did recant his testimony concerning who shot Victim, there was no recantation of other important facts establishing Defendant's liability for the crimes with which he was charged. In the sworn statement, for example, Brown admitted there was a meeting at Michael's house a day or so before the murder occurred at which the following events took place: (1) a plan was formulated to lure Victim to Haywood City where Tyrone would be waiting to execute Victim; (2) Victim's murder would enable the group to steal and divide the drugs Victim had left with Michael; (3) Defendant was present while the murder was being planned; (4) everyone at the meeting, including Defendant, knew Tyrone was going to kill Victim; (5) Michael gave Tyrone the 9mm Beretta later used to kill Victim; and (6) Defendant received a share of Victim's drugs when they were divided that evening. According to Brown's sworn statement, the plan was carried out on May 30, 2000 and resulted in Tyrone murdering Victim with the 9mm Beretta.[5] Assuming, *arguendo,* that Tyrone actually killed Victim, the foregoing facts are still sufficient to support Defendant's conviction for first degree murder and armed criminal action on an accomplice-liability theory.

■■■ The three elements of first degree murder are: (1) knowingly; (2) caus-

---

**5.** Brown's sworn statement also confirms that Defendant and Wiley were in Haywood City on Hickory Street at the time the murder occurred, just as Brown testified at the trial and Defendant admitted to the police.

ing the death of another person; (3) after deliberation upon the matter. § 565.020.1; *State v. Carter*, 71 S.W.3d 267, 272 (Mo. App.2002). In a first degree murder case premised on accomplice liability, the jury also must find that the defendant personally deliberated upon the murder. *State v. Ferguson*, 20 S.W.3d 485, 497 (Mo. banc 2000); *State v. Salazar*, 978 S.W.2d 469, 470 (Mo.App.1998). Deliberation is defined as "cool reflection for any length of time no matter how brief." § 565.002(3). "Like any state of mind, deliberation generally must be proved through the surrounding circumstances of the crime." *Ferguson*, 20 S.W.3d at 497; *see also State v. Rousan*, 961 S.W.2d 831, 841 (Mo. banc 1998). Circumstances in which deliberation may be inferred in a case of accomplice liability for first degree murder include any one of the following:

1. Prior to the murder, there was a statement or conduct by the defendant, or a co-participant in defendant's presence, indicating a purpose to kill another human being. *State v. Gray*, 887 S.W.2d 369, 376–77 (Mo. banc 1994); *State v. Betts*, 646 S.W.2d 94, 95 (Mo. banc 1983).

2. The murder was committed by means of a deadly weapon, and the accomplice was aware that the deadly weapon was to be used in the commission of a crime. *Gray*, 887 S.W.2d at 377; *State v. Turner*, 623 S.W.2d 4, 6–7 (Mo. banc 1981).

3. The accessory either participated in the homicide or continued in the criminal enterprise when it was apparent that a victim was to be killed. *Gray*, 887 S.W.2d at 377; *State v. Lindsey*, 507 S.W.2d 1, 2 (Mo. banc 1974).

Here, all three circumstances continue to exist even after taking Brown's recantation into consideration. Defendant was present during a meeting at which Victim's murder was planned. Participating in the planning of an offense is one of the acts specifically proscribed by § 562.041.1(2), which imposes criminal responsibility upon one person for the conduct of another.[6] Everyone at the meeting, including Defendant, knew Tyrone was going to kill Victim. Defendant was aware that Michael gave Tyrone the Beretta for the purpose of killing Victim, and this handgun was the weapon later used to murder Victim. After Defendant became aware that Victim was going to be killed so the group could steal his drugs, Defendant continued to participate in the criminal enterprise by receiving a share of the drugs that were divided up at the meeting.

Brown's recantation also is insufficient to completely exonerate Defendant of the crime of armed criminal action. As relevant here, the two elements of this crime are: (1) Defendant's commission of the underlying felony of murder in the first degree; and (2) commission of the murder "by, with, or through the use, assistance, or aid of a dangerous instrument or deadly weapon . . . ." § 571.015.1; *State v. Danikas*, 11 S.W.3d 782, 789 (Mo.App.1999); *State v. Anderson*, 867 S.W.2d 571, 574 (Mo.App.1993). As previously noted, Defendant knew the murder would be committed through the use of the Beretta, a deadly weapon, and Victim later was killed by this weapon.

Brown's post-trial affidavit and sworn statement do not constitute newly-discovered evidence of sufficient gravity that a

---

**6.** This statute states, in pertinent part, that "[a] person is criminally responsible for the conduct of another when . . . (2) Either before or during the commission of an offense with the purpose of promoting the commission of an offense, he aids or agrees to aid or attempts to aid such other person in planning, committing or attempting to commit the offense."

miscarriage of justice will occur unless we order a remand permitting the inclusion of such evidence in the record. Therefore, we deny the motion to remand. *See State v. Hill,* 884 S.W.2d 69, 77 (Mo.App.1994); *State v. Hicks,* 803 S.W.2d 143, 146 (Mo. App.1991).

### Point I

■ In Defendant's first point, he contends the trial court erred in failing to admonish the jury to disregard evidence of prior uncharged misconduct after ruling such evidence inadmissible. This contention arises from the following testimony elicited from Brown at the conclusion of his redirect examination by the State:

Q. Now, how long have you been trying to deal in drugs?

A. 2000, before this happened.

Q. And prior to this, did you have much experience in dealing with drugs with anybody?

A. No.

Q. And when you got started with this, who was your partner in this?

A. Willekis.

Q. Now, Mr. Davis is getting—

MR. DAVIS: Objection, Judge. May we approach?

THE COURT: You may.

(At this time counsel approached the bench, and the following proceedings were had:)

MR. DAVIS: Judge, this is clearly indicative of prior uncharged bad acts. "Who was your partner in this?" He said, "Willekis," right?

MR. BOYD: We were—He said (indiscernible).

MR. DAVIS: Okay. I would ask the Court to instruct the jury to disregard the last statement.

MR. BOYD: (Indiscernible) conspiracy, Your Honor.

MR. DAVIS: It's not part of the conspiracy.

MR. BOYD: It's knowledge and intent.

THE COURT: All right. I'm going to sustain the objection. (Indiscernible.) I think—Why don't you all—(Indiscernible.)

(Proceedings returned to open court.)

At this point, the prosecutor began to pursue a new line of questioning.

■ The transcript in this case was created from sound recordings made at the trial. Because the recording apparatus failed to completely preserve all of the proceedings at the bench conference, we are unable to discern whether the trial court granted, denied, or simply failed to rule upon defense counsel's request that the jury be admonished to disregard Brown's last statement. The transcript contains many other instances in which portions of the testimony could not be understood so as to be transcribed, resulting in additional parts of the record being described as "indiscernible." Under the circumstances, we believe the following cautionary words concerning the limitations of a sound-recording system bear repeating for the edification of trial judges:

Magnetic tape recording devices cannot make known an inability to record sounds they do not register. Court reporters can make known an inability to hear testimony and other matters so that statements that would otherwise be "inaudible" may be restated. The 141 "inaudibles" in this record suggest that there are types of cases in which magnetic tape recording devices should not be used. Many jury trials, due to the number of participants and the manner in which testimony may be presented, do not lend themselves to a record made by machine that cannot make known the shortcomings of lawyers or witnesses (or

even judges) who may not speak in a manner that can be recorded. Fortunately, the shortcomings identified in the majority opinion do not require a new trial in this case. Future cases with such omissions may not be so fortunate. The type of record used at trials should be adequate for the circumstances of the case being tried.

*State v. Koenig,* 115 S.W.3d 408, 418 (Mo. App.2003) (Parrish, J., concurring). The type of record used at Defendant's trial was not adequate for the circumstances of the case being tried. Nevertheless, a transcript that is inaccurate or incomplete does not automatically require reversal. *State v. Franklin,* 16 S.W.3d 692, 695 (Mo.App. 2000); *State v. Anthony,* 837 S.W.2d 941, 945 (Mo.App.1992). No new trial is required here because Brown's redirect testimony was cumulative of other testimony that he had given without objection. At the very beginning of Brown's direct examination by the State, he testified that he had known Defendant, Wiley, Tyrone and Michael since elementary school. During the summer of 1999, Brown testified that he started running the streets and selling drugs with these individuals:

Q. What changed in the summer of '99 for you?

A. Attitude.

Q. And could you tell the ladies and gentlemen of the jury what you're talking about? What kind of attitude have you changed?

A. Well, at first I was going to school every day, got a—I had—I was working. Started hanging out with friends and started running the streets.

Q. Now, was Willekis in school in '99?

A. No.

Q. And what about Hershal?

A. No.

Q. What about Tyrone?

A. No.

Q. All right. Now, how—when you say you started running with— What did you guys start doing?

A. Started running around and selling drugs.

Q. And where did you get those drugs at?

A. Tyrone.

Q. Now, how old is—Now, you're 16 at this point in time, and Willekis is about how old?

A. 17 or 18.

Q. And what about Hershal?

A. About 17.

Q. And how old was Tyrone?

A. I'd say 21 or 22.

Q. And what about Michael?

A. Probably about 25, somewhere around in there.

Q. Now, you started running around and doing this stuff with them. Did you happen to get involved, was there something going on close to May 30, 2000?

A. Yes.

Defendant did not object to this testimony, which plainly told the jury that Brown, Defendant, Wiley, Tyrone and Michael all were involved with selling drugs together. Assuming the trial judge erred in failing to admonish the jury to disregard Brown's testimony to the same effect on redirect, we discern no prejudice to Defendant. "Erroneously admitted evidence is not considered prejudicial where similar evidence is properly admitted elsewhere in the case or has otherwise come into evidence without objection." *State v. Collis,* 139 S.W.3d 638, 641 (Mo.App.2004); *see State v. Bucklew,* 973 S.W.2d 83, 93 (Mo. banc 1998); *State v. Gilbert,* 121 S.W.3d 341, 346 (Mo. App.2003); *State v. Ponder,* 950 S.W.2d

900, 910 (Mo.App.1997). Defendant's first point is denied.

### Point II

In Defendant's second point, he contends the trial court erred in denying his request for a mistrial after he learned of a discovery violation by the State. This claim of error arises from the following events.

On cross-examination, Defendant was asked whether he had discussed Victim's murder with an inmate named Charles Williams while Defendant was being held at the Cape County jail:

Q. And did you discuss the case with Mr. Williams?

A. No, sir, I did not. I mean, I don't know who you're talking about.

Q. That's all right. I'm just asking you questions. You can say yes or no. Did you indicate to Mr. Williams that you were paying some girls to come to court to tell lies for you?

A. No, sir.

Q. And did you tell Mr. Williams about how good you were with a gun and how straight you were about robbing people and shooting people?

A. No, sir, I did not.

Q. You remember being up there in Cape County Jail, though, in B pod, don't you?

A. Yes. Yes, I do.

Q. Uh-huh. And did you admit to Mr.—Mr. Williams that you, in fact, did shoot Don Prude?

A. No, sir, I did not.

Q. Did you also tell Mr. Williams that you're going to kill Earl Brown whenever you got out because he didn't keep his mouth shut?

A. No, sir, I did not. I have no reason to.

Defense counsel asked one redirect question to confirm that Defendant did not know a Charles Williams, and the defense rested. The court took a recess because the State's rebuttal witnesses were not yet available.

During the break, defense counsel learned that the State had taken a statement from Charles Williams. When proceedings resumed, but before the jury returned to the courtroom, counsel asked the trial court to examine the document to determine whether it included any statements attributed to Defendant. If so, counsel argued there had been a *Brady* violation because Defendant had an absolute right to obtain a copy of any statements he made during discovery.[7] Counsel also asked for a mistrial. The trial court made the following ruling:

After doing some research on the law, which is necessary sometimes, my ruling is going to be that I'm going to exclude the testimony of Charles Williams, and I'm going to instruct the jury to disregard the questions and the answers regarding Charles Williams and anything that Mr. Dorsey may have said to Mr. Williams in the Cape County Jail. I think that the State should have turned over to the Defendant any statements, whether exculpatory or inculpatory, that the Defendant may have made and the name of any person who the Defendant may have made the statements to, but I don't find that the failure to do that is so prejudicial to warrant a mistrial because the witness did not actually testify. But I think that the problem will be cured by not allowing Mr. Williams to testify, and I think also by the Court instructing the jury not to—or, in other words, instruct-

---

7. *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

ing the jury to disregard any of those questions and answers that were previously given, talked about with Mr. Williams.

After the jurors were reseated, the trial court instructed them to disregard the questions and answers about whether Defendant made any statements to Williams and to not consider the questions and answers during deliberations.

■■■ Defendant argues the trial court should have granted a mistrial because the relief granted was inadequate. Declaring a mistrial is a drastic remedy that should only be employed in those extraordinary circumstances in which the prejudice to a defendant can be removed in no other way. *State v. Schneider,* 736 S.W.2d 392, 400 (Mo. banc 1987). The decision whether to declare a mistrial rests largely within the discretion of the trial court because the judge has observed the incident that precipitated the request for a mistrial and is in a better position than an appellate court to determine what prejudicial effect, if any, the incident had on the jury. *State v. Webber,* 982 S.W.2d 317, 322 (Mo.App.1998). We will not reverse a trial court's exercise of discretion absent a showing of clear abuse and substantial prejudice resulting to the defendant. *Id.* at 322–23.

Here, the trial court found there had been a violation of Rule 25.03(A)(2) because the State failed to disclose Williams' statement to the defense. "A mistrial is not required just because a Rule 25.03 violation by the prosecutor has occurred." *State v. Scott,* 943 S.W.2d 730, 736 (Mo. App.1997). Instead, the court had a range of other options from which to choose to remedy the violation. "When a party has failed to comply with an applicable discovery rule, the court may order disclosure of the information, grant a continuance, exclude such evidence, or enter such other

orders it deems just under the circumstances." *State v. Wallace,* 43 S.W.3d 398, 402 (Mo.App.2001). The court chose to exclude Williams' testimony and to instruct the jury to disregard the questions and answers about whether Defendant made any statements to Williams.

■■■ We disagree with Defendant's assertion that this remedy was inadequate because the prosecutor's questions informed the jury of the contents of Williams' statement. Prior to opening statements, the trial court read MAI–CR 3d 302.02 to the jury. This instruction specifically advised jurors that they "must not assume as true any fact solely because it is included in or suggested by a question asked a witness. A question is not evidence, and may be considered only as it supplies meaning to an answer." Jurors are presumed to know and follow the instructions they are given. *State v. Madison,* 997 S.W.2d 16, 21 (Mo. banc 1999); *State v. Rose,* 86 S.W.3d 90, 103 (Mo.App. 2002). The judge reminded jurors of this instruction when he admonished them to disregard the questions and answers concerning Williams. Furthermore, Defendant steadfastly denied knowing or talking to Williams when answering the prosecutor's questions. Since the State was precluded from calling Williams as a witness, this line of questioning appeared to be more harmful to the State than the Defendant. Accordingly, we conclude the trial court did not abuse its discretion in denying the request for a mistrial because there is no reasonable likelihood the State's discovery violation affected the result of the trial. *See Wallace,* 43 S.W.3d at 403. Defendant's second point is denied.

*Point III*

■■■ In Defendant's third point, he urges reversal because the trial court per-

mitted witness Michelle Rhoden ("Rhoden") to testify, over objection, that she saw Brown in a car with Defendant and Wiley after the murder. Defendant contends Rhoden's testimony was speculative because she had testified at the preliminary hearing and was unable, at that time, to identify who was in the car with Defendant and Wiley. The facts relevant to this point are set forth below.

Rhoden was called as a witness by the State. On May 30, 2000, she lived in a house across the street from where the murder occurred. She was walking to her car when she heard the shots that struck Victim. Rhoden went into her Mother's house, which was next door, and remained there 5–10 minutes. When she returned to her car and pulled out onto Hickory Street, she saw Defendant and Wiley together in an automobile. Rhoden went to a café, but she returned to the crime scene with an acquaintance to see whether they could identify the person who had been killed. Once there, Rhoden again saw Defendant and Wiley sitting together in a car across the street from Rhoden's house. She spent about five minutes viewing Victim's body, but did not recognize him. When she left to return to the café, she saw Defendant, Wiley and a third person together in Wiley's car. The car was near a little pathway on Hickory Street along the route to the café. Rhoden then gave the following testimony:

Q. Now, who do you believe that third person was based upon what you saw that day?

MR. DAVIS: Objection, Judge. Calls for speculation. She already testified she didn't know who it was.

MR. BOYD: Observation, Your Honor.

THE COURT: Well, she can—you can answer if you know.

BY MR. BOYD:

Q. Who did you think that third person was that was in the backseat with Hershal and Willekis?

A. Earl.

Q. And why did you think that?

A. It looked—

Q. How long have you known—Put it that way. How long have you known Earl?

A. I went to school with him.

Q. What's that?

A. I went to school with him.

Q. All right. Do you know him on sight?

A. Huh? ..

Q. Do you know him on sight?

A. I mean—

Q. Just when you see him? You know—You know him when you see him?

A. Yeah.

Q. And did you believe that was Earl with—with Willekis and Hershal there in the backseat?

A. I believe so.

On cross-examination, Rhoden admitted she had testified at the preliminary hearing one month earlier. At this hearing, Rhoden stated that she had seen a third person in Wiley's car, but she did not know who the person was. Further questions on cross-examination, however, demonstrated that Rhoden was very reluctant to testify and did not initially tell the police what she knew until they accused her of lying and threatened to arrest her or charge her with perjury. On redirect examination, Rhoden conceded that she believed Brown was the third person in the car, but she wasn't sure.

Defendant argues the admission of this testimony was so prejudicial that a new trial is required. We resolve this point against Defendant on the same ground as

his first point. After Rhoden testified, the State called Brown as a witness. He testified unequivocally that Defendant and Wiley were supposed to pick him up after the killing as a part of the murder plan. Once Victim was shot, Brown ran down a pathway and met Defendant and Wiley on Hickory Street as they were heading out of the neighborhood. Brown got into Wiley's car and rode back to Sikeston with them. Brown's testimony, which was based on his own personal knowledge of the events in question, was received without objection. Assuming the trial court erred in admitting Rhoden's equivocal testimony (which was quite effectively impeached by defense counsel), it was merely cumulative of Brown's properly-admitted testimony of like tenor. *State v. Simms,* 131 S.W.3d 811, 815 (Mo.App.2004); *State v. Winegarner,* 87 S.W.3d 923, 925–26 (Mo. App.2002). Defendant's third point is denied.

*Point IV*

Defendant's final point contends the trial court erred in failing to grant a mistrial *sua sponte* because the State made three improper comments during its closing argument: (1) a reference to Defendant having been a drug dealer with Brown; (2) Defendant and Wiley having told different stories to the police; and (3) Brown being grilled by four defense attorneys who tried to shake his story with tricky questioning. Defendant claims the first argument was improper because the trial court had excluded the evidence that Defendant had been a drug dealer. He challenges the second argument because there was no evidence Wiley ever talked to the police. Defendant characterized the third argument as an impermissible personal attack on defense counsel.

Defendant concedes that he objected to none of the comments and requests plain error review pursuant to Rule 30.20. Under the plain error rule, Defendant is not entitled to relief unless he demonstrates that manifest injustice or a miscarriage of justice will occur unless the error is corrected. *State v. Worthington,* 8 S.W.3d 83, 87 (Mo. banc 1999).

By its very nature, an argument that a trial court committed plain error by failing to intercede *sua sponte* and prohibit improper closing argument offers a defendant "little chance of success." *State v. Kirk,* 918 S.W.2d 307, 309 (Mo.App.1996). Plain error will seldom be found based upon a comment in closing argument to which no objection was made. *State v. Faulkner,* 103 S.W.3d 346, 362 (Mo.App.2003); *State v. Lawson,* 50 S.W.3d 363, 367 (Mo.App.2001). This is because "alleged errors committed in closing argument do not justify relief under the plain error rule unless they are determined to have a decisive effect on the jury." *State v. Sidebottom,* 753 S.W.2d 915, 920 (Mo. banc 1988). For an improper argument to have a decisive effect, "there must be a reasonable probability that, in the absence of these comments, the verdict would have been different." *State v. Roberts,* 838 S.W.2d 126, 132 (Mo.App. 1992).

This high threshold for obtaining relief under the plain error rule is necessary for two reasons. First, trial strategy looms as an important consideration. *State v. Cobb,* 875 S.W.2d 533, 537 (Mo. banc 1994). We presume counsel's failure to object was the result of trial strategy, not error. *State v. Bristol,* 98 S.W.3d 107, 114–115 (Mo.App.2003); *State v. Elam,* 89 S.W.3d 517, 523 (Mo.App. 2002); *State v. Edwards,* 30 S.W.3d 226, 232 (Mo.App.2000). Counsel may intentionally fail to object because a responsive or retaliatory argument will be more powerful and more beneficial to the defendant

than making an objection which is sustained. Second, in the absence of an objection and a request for relief, a trial judge's only option is uninvited interference with summation, which increases the risk of error by the very act of such intervention. *State v. Edwards,* 116 S.W.3d 511, 537 (Mo. banc 2003). As our Supreme Court has recognized, "[a] holding that would require the judge to interrupt counsel presents a myriad of problems." *State v. Winfield,* 5 S.W.3d 505, 515 (Mo. banc 1999). We do not find that such uninvited intervention was required here.

▉ The comment about Defendant being a drug dealer was a proper argument. It was based on the testimony that Brown gave at the beginning of his direct examination, and the comment helped explain the relationship and motives of the various persons involved in Victim's murder. As we pointed out in ruling on Defendant's first point, Brown's direct-examination testimony on this subject was admitted long before the trial court sustained an objection to a similar question and answer during Brown's redirect examination. Therefore, there was evidence to support the prosecutor's statement.

▉ The comment about Wiley telling police a different story than Defendant was improper because it does not appear to have been supported by the evidence. *See State v. Storey,* 901 S.W.2d 886, 900 (Mo. banc 1995) (a prosecutor may not argue facts outside the record). We are not persuaded, however, that the jury would have reached a different verdict if this comment had not been made. The comment was made only once, and the prosecutor did not describe what differences, if any, existed between the account of events given by Defendant and Wiley. The jury also knew Wiley had not been called by either side as a witness, and no other witness had testified about any statements Wiley made to the police. Before retiring to deliberate, the jury was given MAI–CR 3d 302.06, which stated that "[t]he attorneys will now have the opportunity of arguing the case to you. Their arguments are intended to help you in understanding the evidence and applying the law, but they are not evidence." We presume the jurors followed this instruction. *State v. Madison,* 997 S.W.2d 16, 21 (Mo. banc 1999); *State v. Rose,* 86 S.W.3d 90, 103 (Mo.App.2002). Accordingly, this isolated comment did not have a decisive effect on the jury.

▉ The final comment in dispute concerns Brown being questioned by four defense counsel prior to trial. This evidence was adduced by defense counsel, who asked Brown if he remembered giving a deposition attended by the prosecutor and four defense attorneys. Defendant's counsel thereafter used Brown's deposition on several occasions to refresh his recollection about testimony he had given. At no point did Brown appear to testify differently at trial than he did at his deposition. We do not interpret the State's comment about Brown being questioned at deposition as a personal attack upon defense counsel. Instead, we believe the comment was simply intended to point out that Brown had told the same story in his deposition, despite being intensely questioned by four defense attorneys about what had occurred. "It is a prosecutor's right to comment on the credibility of witnesses from the State's viewpoint." *State v. Cummings,* 134 S.W.3d 94, 105 (Mo.App. 2004).

Defendant has failed to demonstrate that manifest injustice or a miscarriage of justice will result unless we grant his request for a new trial. Therefore, we deny his final point on appeal.

Having given careful consideration to each of Defendant's points, we find that the trial court did not err for any of the reasons asserted in his appeal. We also conclude that his request for a remand should be denied. Therefore, the trial court's judgment is affirmed.

PARRISH, P.J., and SHRUM, J., concur.