**STATE of Missouri, Respondent,**

v.

**Gregory A. NORMAN, Appellant.**

No. 27594.

Missouri Court of Appeals,
Southern District,
Division One.

Dec. 17, 2007.

Petition for Rehearing or
Reconsideration and Transfer
Denied Jan. 3, 2008.

Application for Transfer Denied
Feb. 19, 2008.

---

Irene Karns, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., and Daniel N. McPherson, Jefferson City, for respondent.

DANIEL E. SCOTT, Judge.

Defendant Greg Norman was convicted of murdering his brother Rick.[1] We find no merit to his five claims of error and affirm the judgment.

### Facts and Background

Rick Norman and defendant were the oldest of five siblings. After their father died, defendant accused Rick of conspiring with their stepmother to steal the estate. Defendant eventually filed a will contest against his siblings and the stepmother. The siblings hired a lawyer, designated Rick as their contact person, and counter-claimed for a share of $103,000 "trust money" in defendant's possession. Rick filed an affidavit supporting the siblings' motion, in effect, to "freeze" the $103,000 while the case was pending. The motion was set for hearing December 19, 2001.

Defendant was present for depositions on December 17, two days before the scheduled hearing. The siblings' lawyer offered to cancel the hearing if defendant would deliver the money to his lawyer or to the siblings' lawyer. Defendant said he would decide by noon the next day (December 18). Defendant then asked two of his siblings to get the hearing and their counterclaim stopped. One of them described defendant as frantic and panicky. Defendant, it was later determined, had virtually depleted the $103,000, perhaps to just $2,059.

Late the following morning, the day before the scheduled hearing, Rick Norman was working at home. Mary, his wife, was at their nearby photography studio. She returned at noon to find the back door ajar, blood everywhere, and Rick's body down the hallway. He was shot in the chest, upper arm, lip, and head. Investigators eventually concluded that he was shot near the back door, but struggled to his feet and down the hall, leaning on the walls for support. After collapsing again in the foyer, he was fatally shot in the head.[2] Autopsy results and a shell casing under his body indicated Rick was killed by a .25 caliber shot from 18 inches or less, just above the right ear. Two men working nearby told police they heard what sounded like three small-caliber gunshots about 11:45 a.m. A tire-tread impression, not from Rick's or Mary's vehicle, was recovered near the rear driveway.

Police went to defendant's home that evening. No one answered when they knocked and identified themselves, although the front door was slightly open, the lights were on, and three vehicles were parked there. Officers who went to the back could see persons inside. The offi-

---

1. This case involved various members of the Norman family. First names and nicknames were used at the trial for convenience and clarity. We mean no disrespect in doing likewise.

2. Alternatively, he was fatally shot, then collapsed.

cers at the front kept knocking and identified themselves even more loudly. They also called the residence several times and heard the phone ringing inside. Still no one responded. The officers in back reported they could see defendant inside with guns. The officers pulled back until they could get a search warrant. The search warrant arrived about 12:30 a.m., and defendant came out about 25 minutes later. The police took his shoes and socks and searched the home, finding 11 long guns, a .45 caliber pistol, various kinds of ammunition, and a video monitor hooked up to several cameras around the house and wired with an alarm. No .25 caliber weapon was found, but there was .25 caliber ammunition; an empty box of .25 caliber shell casings; and reloading equipment with .25 and .45 caliber die sets. There was trial evidence that defendant had owned a small handgun in addition to the .45 caliber pistol.

A Cingular engineer, using phone records and cell-tower triangulation, placed defendant in the general vicinity near the time of the murder. Defendant told his sister he drove by Rick's home that day, but claimed he did not stop. Defendant's tire tread apparently was similar to the impression recovered near Rick's driveway.

A swab of the steering wheel of defendant's vehicle was presumptive for blood, but too minimal for DNA analysis. Defendant's shoes bore blood splatter patterns, insufficient for DNA profiling, but consistent with the wearer standing next to a person shot in the head with a small caliber weapon while lying on the ground.

Defendant did not testify at trial. The jury found him guilty of first-degree murder and assessed punishment at life without parole.

## Point I

■ Defendant challenges the sufficiency of the evidence. Thus, we view the evidence and inferences most favorably to the verdict, and disregard contrary evidence and inferences.[3] *State v. Hayes,* 169 S.W.3d 613, 615–16 (Mo.App.2005).

Defendant claims "the State proved only that he had an opportunity to kill Rick," but no motive. He also cites *State v. Yarber,* 5 S.W.3d 592, 594 (Mo.App.1999) and *State v. Harris,* 602 S.W.2d 840, 845 (Mo.App.1980) as holding that mere presence at a crime scene, even coupled with opportunity to commit the crime, will not sustain a conviction.

We note initially that *Yarber* involved a joint premises issue as to drug possession, while *Harris* was an aider and abetter case. Those situations are inapposite. Defendant concedes there was evidence that he "could have been at Rick's house at the time Rick was killed," with the opportunity to kill him. Evidence also showed defendant did not aid his dying brother, but went home and hid from the police, thus implying his guilt.

■ Motive can be important in a murder case based on circumstantial evidence, but it is not an element of the crime. *State v. Hodges,* 586 S.W.2d 420, 429 (Mo. App.1979). Further, there was evidence from which the jury could have inferred motive. Defendant claimed Rick had conspired to deprive him of his inheritance. Defendant believed, as part of that conspiracy, that he was being followed and his phones were tapped. Defendant would not attend his father's funeral, in part, because Rick was there. Defendant was litigating with Rick and his other siblings over money. Defendant had financial problems, including $27,700 in credit card debt, $27,000

---

**3.** We have so summarized the trial record above and elsewhere in this opinion.

owed on a mortgage loan, and numerous bad checks. Because of Rick's affidavit, defendant faced a hearing to disgorge $103,000 "trust money" that had dwindled to $2,059. Defendant was begging his other siblings to cancel that hearing, scheduled for the day following the murder. Defendant's claim that a money motive is "not persuasive" is more properly directed to a jury. The State did not have to prove motive; *a fortiori*, it did not have to prove an objectively logical motive.

What the State had to prove, directly or circumstantially, was that (1) defendant caused Rick's death; (2) he did so knowingly, *i.e.*, he knew his conduct was practically certain to cause Rick's death; and (3) he did so after deliberation, *i.e.*, cool reflection upon the matter for any length of time no matter how brief. *State v. Butler*, 951 S.W.2d 600, 604 (Mo. banc 1997); RSMo § 565.020.

The evidence of defendant's opportunity, motive, and consciousness of guilt recounted above is sufficient to support the first element. The close-range gunshot to Rick's head was practically certain to cause his death, establishing the second element. *Butler*, 951 S.W.2d at 605. Deliberation, the third element, may be inferred when a defendant had ample opportunity to terminate the crime, or the victim sustained multiple wounds. *State v. Buchli*, 152 S.W.3d 289, 298–99 (Mo.App.2004). Rick initially was shot near the rear of the home. He apparently struggled through the house, trying to save himself, before he was finally killed in the foyer with a virtually point-blank shot above the ear. This reasonably indicates deliberation. *Id.* at 299.

The evidence, although circumstantial, sufficiently supports the conviction. *See, e.g., Butler, supra; State v. Sherman*, 927

S.W.2d 350 (Mo.App.1996); *State v. Moss*, 622 S.W.2d 292 (Mo.App.1981).

## Point II

Officer Brian Perry testified that he found several guns during the search of defendant's home, including the .45 caliber handgun, .22 caliber and .30/30 rifles, and .12 gauge and .410 shotguns. When trial resumed four days later,[4] defendant unsuccessfully sought a mistrial due to Officer Perry's testimony about the guns.

Point II contends that a mistrial was necessary "because this evidence of dangerous weapons was not relevant to any issue in dispute in that Rick was shot with a .25 caliber handgun and none of the weapons found were .25 caliber." Defendant claims such evidence prejudicially suggested that he shot Rick simply because he "was the sort of person who would surround himself with deadly weapons."

The State responds, as it did at trial, that the guns supported its theory that defendant possessed a .25 caliber pistol that he used to kill Rick. The search of defendant's home yielded ammunition for the various guns found there, along with .25 caliber bullets and reloading equipment, but no .25 caliber weapon. The State thus claims the jury could infer that defendant had a .25 caliber gun, but disposed of it after the murder.

Courts employ the drastic remedy of mistrial only when necessary to cure grievous prejudice in extraordinary circumstances where prejudice cannot be removed by other means. *State v. Carter*, 71 S.W.3d 267, 271 (Mo.App.2002). We overturn a trial court's refusal of a mistrial only for abuse of discretion—the ruling

---

4. Officer Perry, who was excused after he finished testifying on a Friday afternoon, was the last witness before the court recessed for a three-day weekend.

must be clearly against the logic of the circumstances and so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *Id.*

■ Weapons usually are admissible if they tend to connect the defendant with the crime or throw any relevant light upon any material matter in issue. *State v. Smulls*, 935 S.W.2d 9, 19 (Mo. banc 1996). Indeed, defendant concedes the challenged testimony was logically relevant to the State's trial theory. Defense counsel asked the jury panel in voir dire if anyone would hold defendant's gun ownership against him, and no one said they would. As we cannot even say the trial court erred in admitting this evidence, we cannot say that it abused its discretion in denying defendant's mistrial request.

## Point III

■ Point III challenges police testimony about seeing defendant inside his home with a handgun and a long gun. Defendant again claims such testimony "affected the verdict in that it suggested that Rick shot Greg[5] simply because he was the sort of person who surrounded himself with deadly weapons."

The State replies that evidence that defendant armed himself and would not respond to police at his door evidenced a consciousness of guilt and provided a complete picture of events. The State also denies that defendant has proved his prejudice claim—*i.e.*, that jurors believed defendant killed Rick just because defendant was a person who possessed guns.

The trial court has broad discretion respecting the relevance and admissibility of evidence. *State v. Adams*, 229 S.W.3d 175, 186 (Mo.App.2007). An appellate court must clearly find an abuse of such discre-

tion to interfere with a trial court's evidentiary ruling. *Id.* at 186–87. Further, with respect to the admission of evidence, appellate courts review for prejudice, not mere error, and reverse only if the error was so prejudicial that it deprived the defendant of a fair trial. *State v. Anderson*, 76 S.W.3d 275, 277 (Mo. banc 2002). Trial court error is not prejudicial unless it is reasonably probable that it affected the trial's outcome. *State v. Forrest*, 183 S.W.3d 218, 223–24 (Mo. banc 2006).

Defendant claims the evidence in question had no probative value or logical relevance. We disagree. Defendant's refusal to respond to police at his door, instead staying inside with guns nearby, arguably infers consciousness of guilt. As with Point II, we also find no basis for defendant's conjecture that jurors held his gun ownership against him, particularly when the jury panelists said they would not do so in response to defense counsel's specific voir dire questions. Even if this evidence was erroneously admitted—a conclusion we do not reach—we find no reasonable probability that it affected the trial's outcome, and no error so prejudicial that it deprived the defendant of a fair trial. *Anderson*, 76 S.W.3d at 277.

## Point IV

■ Defendant claims a mistrial should have been ordered after the prosecutor, in closing argument, appeared to overstate the evidence about defendant owning a .25 caliber handgun.

Defendant's relative Jackie Weeks testified at trial about a small gun he had seen in defendant's possession several years before:

---

5. Obviously, a transposition.

Q. Mr. Weeks, are you familiar with the weapons that your father-in-law, ex father-in-law has owned?

A. In the past, way back when they lived on [sic] the farm house.

Q. Okay. What weapons are those?

A. It was a .45 was the main one that I remember.

Q. And any others.

A. Just a handgun. I have no idea what kind it was.

Q. All right. Do you recall a small .25 caliber handgun that he kept in the Crown Royal bag?

A. No, Ma'am.

Q. On February 12th of 2002, do you recall talking to Detective Allen Neal and Detective Rick Counts?

A. Yes, ma'am.

Q. Do you recall Mr. Counts, Detective Counts, asking you if you remember seeing a smaller handgun, a .25 caliber handgun that Greg kept in a Crown Royal bag?

A. He said—he asked me what caliber it was and I told him I didn't know.

Q. Do you recall telling him, yeah, yeah, I saw that one?

A. I saw a gun in a Crown Royal bag but I told him I didn't know what caliber it was.

Q. Do you recall that it is—it was a small handgun?

A. It was a gun. A gun. A gun.

Q. You don't recall whether it's as big as a .45 or smaller than a .45?

A. I don't remember. It's been so many years ago.

Q. All right. But you're not denying that's what you told Detective Counts?

A. I told Detective Counts that I saw a handgun in a Crown Royal bag and also a .45, but I don't remember what caliber of the gun was in the Crown Royal bag.

During closing argument, the prosecutor argued that "Detective Counts asked Jackie Weeks, did you have [sic] a .25 caliber gun in that Crown Royal bag? Yeah, I saw one." Defendant objected and requested a mistrial, which the trial court denied.[6] The prosecutor then continued, "Ladies and gentlemen, you'll remember when Jackie Weeks was confronted with that statement to Detective Counts by Ms. Rushefsky, his answer, not denying it was, well, I never said what caliber it was."

■ Again, we review a trial court's refusal to grant a mistrial for abuse of discretion—the ruling must be clearly against the logic of the circumstances and so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *Carter*, 71 S.W.3d at 271. "This is because the trial court has observed the complained of incident that precipitated the request for a mistrial and is in a better position than is the appellate court to determine what prejudicial effect, if any, the incident had on the jury." *State v. Wheeler*, 219 S.W.3d 811, 815 (Mo.App. 2007). A mistrial is a drastic remedy,

---

6. The court stated:

"[A]s I recall the testimony, the witness did not deny having made the statement to Detective Counts. And at the time this was being argued about the appropriateness of asking Detective Counts about this, I believe I made some statement about the fact that I'm not sure this was an inconsistency. I believe that was the defendant's argument at the time as well. The State then withdrew any intent to ask Detective Counts about that."

"But what we're all talking about is the same thing, and that is that these statements are in evidence before the jury, and Mr. Patterson is arguing the evidence as presented. The jury will remember the evidence and remember the qualification and other things that the witness gave in this regard."

appropriate only in extraordinary circumstances where prejudice cannot be removed otherwise. *Id.; Carter,* 71 S.W.3d at 271.

■ Reversal for improper argument is appropriate only if the defendant proves the comment had a decisive effect on the jury's decision. *State v. Miller,* 226 S.W.3d 262, 266 (Mo.App.2007); *State v. Hashman,* 197 S.W.3d 119, 134 (Mo.App. 2006). The defendant must show a different verdict was reasonably probable without the error. *Miller,* 226 S.W.3d at 266. We consider the entire record to determine if the error was sufficiently prejudicial to have tipped the scales and denied the defendant a fair trial. *Hashman,* 197 S.W.3d at 134. The trial court was in a better position to assess any prejudicial effect of the comment in question. *Id.*

Assuming the prosecutor briefly misstated the evidence, he immediately clarified and corrected his argument after defendant's objection. The jury was instructed that closing arguments are not evidence. We presume the jury followed those instructions. *Hashman,* 197 S.W.3d at 134. Based on the entire record, defendant has not proven that this single comment was decisive, or that the trial court clearly erred in denying his request for mistrial.

### Point V

■ Defendant finally challenges the trial court's refusal to change venue or import a jury, claiming pretrial publicity so tainted the venire that no petit jury chosen therefrom could have decided the case solely on the evidence. We review for abuse of discretion, and in this regard, discretion is abused " 'when the record shows that the inhabitants of the county are so prejudiced against the defendant that a fair trial cannot occur there.' " *State*

*v. Whalen,* 49 S.W.3d 181, 189 (Mo. banc 2001), *quoting State v. Feltrop,* 803 S.W.2d 1, 6 (Mo. banc 1991).

Defendants argument rests solely on the percentage of venirepersons who had read or heard something about the case. However, the relevant issue is neither publicity nor whether prospective jurors remembered the crime or publicity thereof; but whether the jurors had such fixed opinions that they could not impartially judge the defendant's guilt. *Whalen,* 49 S.W.3d at 189. Thus, against similar publicity complaints, denial of a venue change in another Greene County murder case was upheld because:

> The record reflects that each veniremember who had heard of the case in the media was carefully questioned. Several veniremembers were removed for cause because their answers reflected that they had formed an opinion about Hall's guilt because of their exposure to the media reports. Hall cannot point to any specific juror who had fixed opinions about Hall's guilt and threatened his right to a fair trial.

*State v. Hall,* 982 S.W.2d 675, 682 (Mo. banc 1998).

Similarly, the venirepersons exposed to pretrial publicity in this case were individually questioned, and twenty were struck for cause. Seven others, after individual questioning elicited no predisposed opinion or partiality, served among the twelve voting jurors. All seven had heard of the case sometime in the preceding four years.[7] Some knew defendant was accused of murdering his brother. None could recall specific details of the incident. None had formed an opinion on defendants guilt or innocence. Defendant challenged none of the seven for cause. The record fails to show that any of these jurors "had

---

7. This case was tried more than four years after the crime.

such fixed opinions that they could not impartially judge the defendant's guilt." *Whalen,* 49 S.W.3d at 189.

Defendant cites *State v. Baumruk,* 85 S.W.3d 644 (Mo. banc 2002), which involved a courtroom shooting. The issue there was whether to try the murder case in the courthouse where the crime occurred. Our observations in *Hayes,* 169 S.W.3d at 620, apply equally here:

> It was the location of the crime that precluded the jury in *Baumruk* from being "a panel of impartial 'indifferent' jurors." *Id.* In *Baumruk,* the concern was that the jurors would perceive themselves placed "in the shoes of the victims;" that they "arrived at the courthouse and entered through metal detectors that had been installed as a direct result of Baumruk's shooting spree. Jurors walked the same halls, used the same elevators, stairwells, and escalators that were used by escaping victims. The trial was held in a courtroom nearly identical to the courtroom that was the scene of the crime. The jurors, in effect, sat at the murder scene while determining guilt or innocence and the penalty to be imposed." *Id.* (Footnotes omitted.) The environment of the trial in this case does not pose a question regarding "the impartiality of the adjudicator" as proclaimed in *Baumruk. See Id. Baumruk* is of no consequence to this appeal.

### Conclusion

The judgment is affirmed.

PARRISH, P.J., and BATES, J., concur.