STATE of Missouri, Respondent,

v.

Larry C. HASHMAN, Appellant.

No. WD 64821.

Missouri Court of Appeals,
Western District.

April 4, 2006.

Motion for Rehearing and/or Transfer to
Supreme Court Denied May 30, 2006.

Application for Transfer Denied
Aug. 22, 2006.

Deborah B. Wafer, St. Louis, MO, for appellant.

Shaun J. Mackelprang, Jefferson City, MO, for respondent.

Before JAMES M. SMART, P.J., ROBERT G. ULRICH, and LISA WHITE HARDWICK.

ROBERT G. ULRICH, Judge.

Larry Hashman appeals his convictions for first degree assault, section 565.050,[1] and armed criminal action, section 571.015, and his concurrent sentences of twenty-five years and twenty years imprisonment. Mr. Hashman presents two points on appeal. First, he argues that the trial court erred in not instructing the jury on defense of premises as he requested. Second, he argues the trial court erred in denying his request for a mistrial or, alternately, failing to specifically instruct the jury on the State's burden of proof after the State told the jury in closing argument not to give him the benefit of the doubt. Mr. Hashman's points are denied, and the judgment of convictions is affirmed.

### Facts

On the evening of June 27, 2003, Kansas City police officers responded to a call concerning a "prowler" and a "cutting" at 312 Quincy. Upon entering the house at that address, the officers saw scattered furniture and blood prevalent on the walls, furniture, and floor. One of the officers heard a voice at the back of the house, and the officers saw Larry Hashman coming from the kitchen with a phone in his hand. Mr. Hashman was shaking and his face was bloody; blood was running down his hands, and he had cuts on his head and hands.

Mr. Hashman told the officers that he was in his living room watching television when he heard glass breaking at the back of the house. He grabbed a knife, went to

---

1. All statutory references are to RSMo 2000 unless otherwise indicated.

the kitchen, and saw a black male coming through the back door. He hit the prowler on the head with the knife, and they struggled for control of the knife. The prowler got the knife and hit Mr. Hashman with it. Mr. Hashman broke away, ran to the living room, and pulled a sword from a decorative display of weapons on the wall. Defending himself, Mr. Hashman began swinging the sword at the prowler, who still had the knife. The prowler jumped through a closed window, and Mr. Hashman called 911.

The officers obtained a description of the prowler from Mr. Hashman and began looking for him. An ambulance arrived on the scene as one of the officers found a person lying in the yard next door. The purported prowler was a female, later identified as Deidra Johnson. Ms. Johnson was motionless and unresponsive. She had cuts on her arm and head, puncture wounds to her back, and she was bleeding profusely. She was taken by ambulance to Truman Medical Center.

The next morning, Detective Smith of the Kansas City Police Department reviewed the police report from the previous evening and drove to Mr. Hashman's house. Mr. Hashman and his girlfriend were present. Mr. Hashman told Detective Smith what had occurred and took him through the house. Detective Smith asked Mr. Hashman if he had met the intruder before and whether the intruder had been in the house prior to the time of the offense. Mr. Hashman looked at his girlfriend and answered no to both questions. Mr. Hashman asked to speak with Detective Smith outside the presence of the girlfriend. Once he was alone with Detective Smith, Mr. Hashman stated that "to spice up his relationship" with his girlfriend, he had brought a prostitute to his house and they had argued about the payment for her services. At this point, Detective Smith stopped Mr. Hashman because his statement of the event had changed from an unknown intruder breaking into the house to his bringing a prostitute into the house. Mr. Hashman started crying and stated that he would tell Detective Smith "everything." Detective Smith called a patrol wagon, and Mr. Hashman was arrested for aggravated assault and taken to the police department.

Before again speaking with Mr. Hashman, Detective Smith interviewed Ms. Johnson at Truman Medical Center. Ms. Johnson relayed what had occurred from the time she made contact with Mr. Hashman until the time she jumped through the closed window to get out of the house.

Detective Smith testified at trial that when he interviewed Mr. Hashman at the police station Mr. Hashman gave the following account of what had occurred. Mr. Hashman brought Ms. Johnson to his house because she was a prostitute. Mr. Hashman and Ms. Johnson had sexual intercourse. Mr. Hashman then took money away from Ms. Johnson that she had stolen from him and tried to put her out of his house. A struggle ensued, and Mr. Hashman banged Ms. Johnson's head on the door to get her out of the house. Ms. Johnson was put out of the house without her possessions, and she banged on a door to get back inside. A window in the door was broken at some point. During the struggle, Mr. Hashman grabbed Ms. Johnson by the face, and she bit him. In response, Mr. Hashman grabbed a knife and hit Ms. Johnson with the blade. He did not want to hit her again, and he dropped the knife. Ms. Johnson picked up the knife and began to hit Mr. Hashman with it. Mr. Hashman then got a sword. He slashed her and continued slashing her after she dropped the knife. He chased her and slashed at her, and she collapsed on the floor. Mr. Hashman thought she

was dead. He tried to smoke a cigarette, but could not light it; he tried to call people, but could not remember the numbers. He went into the bathroom and, while there, Ms. Johnson jumped through the closed window. Mr. Hashman then called the police. He stated he made up the story about a prowler because he was afraid of going to prison and of how his girlfriend would respond if she knew he had brought a prostitute into the house.

Detective Smith commented that Ms. Johnson could die or lose her arm and asked Mr. Hashman if he wanted to say anything to her. Mr. Hashman wrote the following note to Ms. Johnson:

> Deidra, I am sorry for what I did to you. I know you are in a great amount of pain and you don't deserve to be. I also know it is my fault that I lost my temper and I know you must hate me. I do wish my apology to be sincere. I know you will lose your arm. I also know I will lose my life to prison. I am sorry for cutting you. I lost control and freaked out. It's no excuse. I know I will be punished. I asked the detective if you had a family. I am sorry for them too. My family I hurt them by doing this. I am sorry!

At Detective Smith's request, Mr. Hashman also gave a formal transcribed statement of the event.

Ms. Johnson remained in the hospital for nearly a month. The knuckles on her right hand were cut across the fingers, so that the tendons had to be reattached. Ms. Johnson was unable to straighten her right hand or make a full fist. She also fractured her elbow during the fall through the window, which required surgical repair resulting in a surgical scar. The sword blow to Ms. Johnson's left arm severed all the nerves. She had to wear a wrist brace to be able to lift her wrist. She had no feeling from the middle of her fingers all the way up to the elbow, and her arm was scarred. Ms. Johnson also had stitches and staples placed in her head to repair the cranial wounds. A scar resulted where the staples were on the back of her neck. She had multiple keloid scars on her back where the injured tissue "puffed out." She also had to relearn to feed herself and to use her arms and hands. She required assistance in clothing, washing, and feeding herself.

Mr. Hashman was charged in an amended information as a prior and persistent felony offender with one count each of assault in the first degree, § 571.050, RSMo, and armed criminal action, § 571.015, RSMo.

Ms. Johnson acknowledged that in June 2003 she was a crack addict and supported her habit by prostitution. At the time of the incident, she had been living "on the streets" for five or six years, moving between shelters, people's houses, and sleeping outside in different places. She kept all her belongings in two bags; one was for clothes and the other was for "hygiene." She kept these bags with her at all times.

Her daily routine was to "roam the streets, standing on the corners to make money to support [her] habit and buy drugs and repeat the same cycle." Someone driving by would stop at her corner or she would "flag" them down and negotiate a price for a sexual act. Once the negotiations were concluded, she would get into the car, and they would go to a secluded area. She testified she would get her money first and then perform the sexual act, almost always in the car. She would then get a ride back to her corner.

She has done this six or seven times with Mr. Hashman before the incident for which he was charged, and he had always been very polite and never harmed her.

On the morning of June 27, Mr. Hashman encountered Ms. Johnson and gave her five dollars, telling her he would be back later. Mr. Hashman drove up later and offered to give Ms. Johnson more money if she went to his house. He showed her a "bunch" of money, and she agreed. En route to Mr. Hashman's house, Ms. Johnson asked him to buy her "some dope." While he refused, he did take her to obtain it and also bought her some fast food because she was hungry. Mr. Hashman parked at the rear of his house, and he and Ms. Johnson entered through the back door.

Mr. Hashman gave Ms. Johnson thirty dollars. He heated her food, and she smoked the ten dollars worth of crack she had purchased. At Mr. Hashman's invitation, Ms. Johnson went into the bathroom and took a shower; she remained inside the bathroom for approximately an hour. Mr. Hashman did not disturb her during this time. When she came out of the bathroom, she and Mr. Hashman had sexual intercourse on the dining room floor. Afterward, she went back into the bathroom to clean up; she took her clothes with her and got dressed. When she came out of the bathroom, she did not see Mr. Hashman and began "hollering his name."

Ms. Johnson testified that Mr. Hashman came around the corner with a sickle "like a V-shaped knife with a handle on it."[2] He struck her on the head several times before she realized what was happening. Then she began to fight back. The fight moved into the kitchen and, when Mr. Hashman dropped the knife, she picked it up and hit him a couple of times. She dropped the knife and ran into the living room, looking for another exit. Ms. Johnson reached for a door handle and "realized [she] couldn't grab the handle because [her] fingers were dangling on the other

side of [her] hand." She tried to open the door with her mouth, and failing, she turned to see Mr. Hashman pulling a sword from a display on the wall. He swung the sword at her arm. Her arm "flew behind" her and lost feeling; she thought it had been cut off.

Ms. Johnson testified that she then began falling and sliding in the blood. Mr. Hashman dropped the sword and turned away from her. She left the house by jumping through a closed window in the dining room. She landed on the ground and heard him, at the window right above her, calling the police and asking them "to get out to his house because someone tried to break in his house, and he hurt them pretty badly." Ms. Johnson testified that she then saw Mr. Hashman coming toward her from the back of the house. She thought "he's not through," jumped up, and fell over the fence into the yard next door where the police found her.

Mr. Hashman testified at trial. He stated that, on the morning of June 27, 2003, he was on his way to pick up some products for his company and saw a woman he had not seen before who was "obviously a prostitute." The woman, Ms. Johnson, tried to waive him down. He saw her again on his return trip; he stopped and she got into his van. Ms. Johnson directed him to an area about three blocks away. He only had five dollars so to "make it worth something, both our time," he asked to see her breasts. She agreed, and, afterward, he took her back to where he picked her up. He then returned to work.

Mr. Hashman testified that later, after he had been paid by his place of employment, he returned to the area and observed Ms. Johnson. She came to his car and, after a brief discussion, she agreed to

2. Mr. Hashman later described this knife as a "buffalo knife."

accompany him. Ms. Johnson directed him to a park where she purchased crack cocaine. She was hungry, and Mr. Hashman purchased fast food for her. Mr. Hashman drove to his house, parked in his backyard, and he and Ms. Johnson entered the house through the back door.

Demanding to be paid before engaging in sexual acts, Mr. Hashman paid Ms. Johnson thirty dollars. Mr. Hashman asked her if she wanted to shower. She went into the bathroom with her two bags and remained in the bathroom for a long time with the water running. Mr. Hashman testified that the water began to sound as though it were running in an empty shower. He heard the bathroom cabinet door squeak, and he wondered if Ms. Johnson was overdosing on cocaine.

Mr. Hashman said that an hour to an hour and a half after she entered the bathroom, Ms. Johnson emerged. She put a bag down and returned to the bathroom for another ten minutes. In her bag, Mr. Hashman saw his Bible and items belonging to his girlfriend, including cosmetics, rubbing alcohol, scented candles, and a coin purse. Mr. Hashman said nothing at this time because he had already paid thirty dollars and did not want to risk not getting what he paid for. Ms. Johnson came out of the bathroom and again smoked crack. Mr. Hashman and Ms. Johnson had sexual intercourse, and she went back into the bathroom to clean up. Ten minutes later she came out of the bathroom and asked Mr. Hashman if he wanted "to do anything else." He declined. Mr. Hashman testified that she then began acting strange. She changed her clothes several times in the dining room, then bent at the waist and swayed back and forth.

Mr. Hashman testified that, once Ms. Johnson was ready to leave, she picked up her bags and went to the desk. He then told her that he knew she had taken his belongings, and they would not leave until the items were returned to him. He informed her that he knew his belongings were in her bags. Ms. Johnson appeared surprised and, while maintaining eye contact with him, she leaned back and grabbed three twenty-dollar bills he had left on the desk. As she walked toward the kitchen, he came up behind her and squeezed her hand, forcing her to drop the money. He took her bags, and they began struggling.

Mr. Hashman testified that he forced Ms. Johnson to the door in the kitchen leading to a back room he used as a tool room or shop. The back door of the house accessed this tool room. She struggled loose and turned to fight him. Several times she grabbed him, and he pushed her "pretty hard," hitting her head or shoulder on the door frame. He finally got the back door open, pushed her out, and locked the door. Ms. Johnson was angry; she yelled and kicked the door. Mr. Hashman testified that he told her he would return her belongings to her and walked away from the door as she cursed and threatened him. He intended to empty the bags, put her property back in the bags, and give them to her.

As he walked into the dining room with Ms. Johnson's bags, he heard a window break. He picked up a knife and put it on the kitchen countertop. Through the broken window of the back door,[3] Mr. Hashman told Ms. Johnson he was going to call the police. Ms. Johnson attempted to reach in through the broken glass and

---

3. Ms. Johnson testified the window in the back door was not broken while she was there—she never made it past the kitchen.

undo the chain lock Mr. Hashman had previously fastened. He walked toward the door. Ms. Johnson was loudly threatening and cursing him. Mr. Hashman put his hand through the broken glass for the purpose of pushing Ms. Johnson away. He testified that he was worried she would damage his car, and he thought that if he opened the door and assured her that he would give her back her clothing, the problem would be resolved. He opened the back door, and Ms. Johnson pushed past him, hitting him with her shoulder. She walked into the kitchen, and Mr. Hashman stepped in front of her, to block her way. She cursed him and demanded her clothes; he grabbed her wrist and told her to "just calm down," and he would get her stuff. She tried to "jerk away."

Mr. Hashman testified he held her chin with two fingers[4] and turned her face toward him. He again asked her to calm down saying he would get her stuff and then take her wherever she wanted to go. She bit his fingers and he could do nothing but cradle his injured hand in his other hand and legs. As he did so, she hit him in the temple with the knife that he had left on the counter. She started to grab him again, he grabbed her, and they began wrestling for the knife. Mr. Hashman obtained control of the knife. Ms. Johnson "kept coming." Mr. Hashman struck her with the knife, dropped the knife, and she fell. He walked into the dining room to get a cigarette and lighter. On his return to the kitchen, Ms. Johnson hit him in the face with the knife. Mr. Hashman testified that he then reached for a sword on the wall. Mr. Hashman testified that Ms. Johnson continued to strike him with the knife as he pulled the sword from the rack. He hit her with the sword a couple of times with no visible effect. When he hit her on the arm, she stopped moving. He released the sword so he could use the phone.

Still armed, Ms. Johnson followed him. He dropped the phone and picked up the sword. They began circling opposite each other. He saw an opportunity, and cut Ms. Johnson. She dropped the knife and fell against the wall; he picked up the knife. Mr. Hashman felt dizzy and shocked and threw the knife on the desk and the sword on the floor. He went into the bathroom thinking that, because of the way that she fell, she would not come after him again. He testified that he thought she might die. While looking at his wounds in the bathroom mirror, he heard a noise and ran from the bathroom. Mr. Hashman testified he saw Ms. Johnson and for a moment they just stood and looked at one another. Then she ran to the window and jumped out. He ran outside, saw Ms. Johnson lying in his neighbor's yard, and called for an ambulance. Mr. Hashman testified that he could see that Ms. Johnson was "really hurt." The 911 operator kept him on the phone until the police arrived.

The jury returned verdicts finding Mr. Hashman guilty of assault in the first degree and armed criminal action. Mr. Hashman was sentenced to twenty-five years imprisonment for assault in the first degree and a concurrent sentence of twenty years imprisonment for armed criminal action. Mr. Hashman's timely appeal followed.

### Point I

In his first point on appeal, Mr. Hashman argues the trial court erred in not instructing the jury on defense of premises[5] as he requested (MAI–3d

---

4. Mr. Hashman's hand had been previously injured.

5. Defense of premises is also known as defense of habitation.

306.310). The State argued that insufficient evidence had been adduced to submit this defense to the jury. It argued that defense of premises should not be submitted to the jury because Ms. Johnson had initially been in the house with Mr. Hashman's permission, that Mr. Hashman's testimony was that he allowed Ms. Johnson back into the house because she was kicking and screaming outside, and that Mr. Hashman wanted Ms. Johnson to come back into the house so that she would become quiet and retrieve her belongings. The trial court refused to give the instruction for defense of premises. Mr. Hashman's counsel preserved this issue for appellate review by including it as a point in his motion for a new trial.

 "On appellate review, a trial court's refusal to submit an instruction to the jury will not be disturbed absent a showing of an abuse of discretion." *Mast v. Surgical Servs. of Sedalia, L.L.C.,* 107 S.W.3d 360, 365 (Mo.App. W.D.2003). "Even where error is found in a trial court's refusal to give an instruction, it is reversible error only if the refusal was prejudicial to the complaining party." *Id.* In determining whether the refusal to submit a jury instruction was error, the evidence is viewed in the light most favorable to the defendant. *State v. Avery,* 120 S.W.3d 196, 200 (Mo. banc 2003). "If the evidence tends to establish the defendant's theory, or supports differing conclusions, the defendant is entitled to an instruction on it." *Id.* (citation omitted).

 Both self-defense and defense of premises are defenses of justification. *Perkins v. State,* 77 S.W.3d 21, 24 (Mo. App. E.D.2002). The use of physical force in defense of premises is governed by sections 563.036 and 563.041.[6] Mr. Hashman wanted an instruction that his use of deadly force was permissible to prevent Ms. Johnson's trespass into his house for the purpose of committing burglary, pursuant to section 563.036.2(2). "In Missouri, defense of premises is essentially accelerated self-defense because it authorizes protective acts to be taken earlier than they otherwise would be authorized, that is, at the time and place where the intruder is seeking to cross the protective barrier of the house." *Avery,* 120 S.W.3d at 204 (quote marks omitted). In self-defense, the defender must have reasonable cause to believe the danger of harm from personal attack is immediate before he is justified in responding to the attack. *State v.*

**6.** All statutory references are to RSMO 2000 unless otherwise stated.
Section 563.036 states:
1. A person in possession or control of premises or a person who is licensed or privileged to be thereon, may, subject to the provisions of subsection 2 of this section, use physical force upon another person when and to the extent that he reasonably believes it necessary to prevent or terminate what he reasonably believes to be the commission or attempted commission of the crime of trespass by the other person.
2. A person may use deadly force under circumstances described in subsection 1 of this section only:
(1) When such use of deadly force is authorized under other sections of this chapter; or
(2) When he reasonably believes it necessary to prevent what he reasonably believes to be an attempt by the trespasser to commit arson or burglary upon his dwelling; or
(3) When entry into the premises is made or attempted in a violent and tumultuous manner, surreptitiously, or by stealth, and he reasonably believes that the entry is attempted or made for the purpose of assaulting or offering physical violence to any person or being in the premises and he reasonably believes that force is necessary to prevent the commission of a felony.
3. The defendant shall have the burden of injecting the issue of justification under this section.

*Johnson,* 54 S.W.3d 598, 603 (Mo.App. W.D.2001). The defender need not wait until the threat of harm is immediate for defense of premises, though; he may respond when he has reason to believe there is immediate danger of unlawful entry. *Id.* This is the difference between self-defense and defense of premises; the former is a defense to immediate harm and the latter is a defense to immediate unlawful entry. *Id.* "The two defenses differ in terms of time and space in that defense of premises is applicable prior to and during the intruder's entry into the dwelling, but once the intruder has entered without resistance, the principles of self-defense apply." *State v. Lumpkin,* 850 S.W.2d 388, 392 (Mo.App. W.D.1993). "[I]n the usual case the facts would not be likely to support submission of both this defense and regular self-defense." *Avery,* 120 S.W.3d at 204. "As long as the evidence shows the intruder has not entered the dwelling, an instruction defining the defense of habitation must be given so the jury can focus on the immediacy of the danger to the entry rather than on the immediacy of the danger of the harm." *Johnson,* 54 S.W.3d at 603. Defense of premises is only available to prevent entry and does not extend to acts punishing the intruder for his or her entry. *State v. Battle,* 625 S.W.2d 252, 254 (Mo.App. E.D.1981).

▆▆▆▆▆ The defendant has the burden of injecting the issue of defense of premises. *Perkins,* 77 S.W.3d at 24 (citing § 563.036.3). To determine whether a defendant has presented sufficient evidence to inject the issue of defense of premises, evidence must have been presented that, under its most favorable construction, supports a finding of defense of premises. *Id.* The defendant's burden is only a burden to introduce evidence. *Johnson,* 54 S.W.3d at 601.

Conflicting versions of what occurred on June 27, 2003, were presented at trial. The evidence is uncontradicted, however, that Ms. Johnson was initially inside Mr. Hashman's house at his request and with his permission. Thus, her initial entry was not an unlawful entry. According to Ms. Johnson, once she entered the house, she did not leave until after she was wounded by the sword and knife and jumped through the closed window. According to Mr. Hashman, Ms. Johnson initially entered the house with his permission, was subsequently pushed from the house, and then she pushed her way back into the house after Mr. Hashman opened the back door to assure her that he was going to return her belongings to her. Ms. Johnson's pushing back into the house, against Mr. Hashman's will, is the act that Mr. Hashman claims was the unlawful entry against which he was defending. The facts are viewed in the light most favorable to Mr. Hashman for purposes of determining whether he presented sufficient evidence to warrant an instruction for defense of premises. *Avery,* 120 S.W.3d at 200.

Mr. Hashman states in his brief that his testimony:

demonstrates that he acted in defense of premises. His testimony showed that his initial actions—forcing Ms. Johnson out of the house, taking a knife with him when he responded to her attempts to break into the house by kicking at the door, breaking the glass, cursing and threatening him—were in response to her threatening actions and were a justifiable defense of premises.

Mr. Hashman's argument necessarily requires his advocating that his initial actions of forcing Ms. Johnson out of the house and taking a knife to the back door were justified by defense of premises. He states that instructing the jury on defense of premises would have allowed the jury to

find that he acted legally in using force "during" Ms. Johnson's second entry into the home.

This argument fails. Mr. Hashman was charged with assault in the first degree, alternatively, assault in the second degree, and armed criminal action. The basis for these charges is Mr. Hashman's "cutting" Ms. Johnson. The jury was properly instructed that to find Mr. Hashman guilty of any of these charges, it must find that he cut her. Mr. Hashman's throwing Ms. Johnson out of the house or having a knife with him when he went to the back door was not the basis for the charges against him. Mr. Hashman testified as follows:

Q What happens once you pushed [Ms. Johnson] out the back door?

A I locked the door. She was hollering, kicking. She was mad, real mad. I told her I was going to give her her stuff back, you know. I had no cause to keep it. It's a female's clothing and that's it. She had female's clothing in the bag, her clothing, and a hairbrush, a broken hairbrush, and that was it. There was nothing else in the bags that belonged to her. The only other thing that was in the bags was the cosmetics that came out of my bathroom and a Bible that came out of my bathroom and a coin purse. The coin purse probably had about $3 in change.

Q So you told her that you were going to give her her bags back, then what did you do?

A I walked away from the door. She's threatening me. She's cursing me. I walked back in towards the bags. My intentions are to empty the bags and put the clothing back in the bags so I can return to her as quickly as possible to try to end all of this.

Q Why are you trying to end all of this?

A I don't want my neighbors to know. I don't want to draw attention to an already bad situation. I didn't bring her over to the house to have a confrontation like this or to make a scene. This will get back to my girlfriend, I'm sure, if it continues, and besides that it's just unnecessary.

Q Okay. So that's your intention. So what do you do?

A I go back in. I recover the bags. There's some clothing, a couple articles of clothing that fell out of the top, and I put them back in. I pick up the bags. I hear the window break as I'm taking the bags into the dining room. On my way back I picked up a knife.

Q What did you do with the knife?

A I set it on the kitchen countertop.

Q Once you set it on the kitchen countertop, what did you do?

A I told her I was going to call the police.

Q Where are you when you are telling her this?

A Right outside the door directly in front of her.

Q Then what happens? Let me ask you this: When you got out there, was the window broken?

A Yes.

Q And what was she doing?

A She was trying to get in. I put the chain lock on earlier. She was trying to reach in and open the door.

Q So what did you do?

A I walked towards her, and she pulled her hand back out. She let me know by her actions she didn't care if I called the police.

Q What do you mean by that?

A She was still loud. She was still trying to get in until the moment she backed back up.

Q And you are saying that she was loud. Was she saying things?

A Oh, yeah.

Q What was she saying?

A She was threatening me, telling me I better give her her clothes back. She was cursing me. She was, you know, pretty much saying that she was going to get her stuff back one way or another.

Q So after she pulled her arm back out, what did you do?

A About the same time she pulled it back I stuck my hand through, and I didn't make contact with her. There was no physical contact, but I was really trying to push her away and not grab her, not to pull her in but to push her away.

Q Then what happened?

A I opened the door. My thought was this. I got a brand-new car in the backyard not 10 feet from her, and I don't want her to work on it next because she wants her clothing. I assumed the only thing she really wants is her clothing. So if I open the door and assure her I'm going to get her clothing for her, then there should be no more problem and this can all just end. The window is really not a problem. I got 20 more in my garage and I got—I have a glass cutter. I work with my hands for a living. I don't really care about it. It was a Plexiglass window.

Q So what happens when you open the door?

A She pushes past me. She hits me with her shoulder. I tried to grab her. Really she just moves around me. Something like a football move I guess. She don't go down or nothing. She's just walking forward and she hits me hard and goes around me.

Q So once she goes around you, what happens next?

A I follow her. She's ahead of me. She goes into the kitchen. She's looking for her bags, I guess, because she looks around.

Q So what do you do?

A I go in front of her. I step in front of her to block her way, and she points her finger at me and shakes it at my face and—

Q Did she say something?

A Yeah. She wants her clothes. She said something like, You better fucking give me my clothes, my stuff. My stuff is what it was. I grabbed her wrist and told her just calm down, I was going to get her stuff, just calm down. She looked away from me and she tried to jerk away, so I grabbed her by her chin. I only grabbed her with a couple fingers because my hand's injured, and I don't really even do it hard because I can't. I just kind of turned her face and she don't really fight me. And she looks at me. I tell her, Just calm down. I'm going to get your stuff, you know, then I'll take you home, wherever you want to go, you know.

Q What happens?

A She bit my hand, my fingers. She jerked—she didn't have to jerk hard to get away from me. I'm only holding her by a thumb and a finger on her face, and she still had a loose hand. She grabbed my hand, my wrist, and bit me and—

Q How did that feel?

A Terrible.

Q What did you do?

A I couldn't do nothing. I couldn't do nothing at first. I did get loose. When I got loose, I cradled my hand and held it. Excuse me. I cradled my hand in my other hand between my legs and she hit me with a knife, and she got—that she got right behind her. It was sitting

on the kitchen counter and I was struck in the temple.

Q Where were you?

A I was in the kitchen.

As testified to by Mr. Hashman himself, he brought the knife to the kitchen and set it on the kitchen countertop. He opened the access door that permitted Ms. Johnson to enter the house for the second time. Ms. Johnson then pushed past him and entered the kitchen. She looked around for her belongings. They had a physical altercation. According to his testimony, *she* then picked up the knife from the countertop and struck him with it. At this point, Ms. Johnson has been inside the house for some time, and Mr. Johnson has yet to do anything that prompted his being charged for assault in the first or second degree or armed criminal action. Defense of premises is no longer viable. There is no immediate danger of unlawful entry; the entry has already occurred. The threat is now one of immediate bodily harm and principles of self-defense apply. Mr. Hashman continued to testify as follows:

Q So what did you do?

A Instinct kicked in and she went to hit me again, and I stopped her. I grabbed her, and we wrestled for the knife.

Q Are you guys still in the kitchen at this point?

A Yes.

Q And what happened?

A I got the knife. She kept coming. She never even backed off.

Q What are you thinking?

A Why is it happening. I didn't do anything, you know, wrong, and I don't know—I really didn't have a lot of time to think. It was just happening.

Q So she came at you. What did you do?

A I grabbed her. We wrestled for the knife and I took it away from her pretty much. She was—she never—she never really got more than a couple feet away from me. She was still there. She was still coming so I hit her with the knife.

This was the first time Mr. Hashman admits to picking up the knife to "cut" Ms. Johnson or attempting to "cut" her. Mr. Hashman asserts that he used the knife to cut Ms. Johnson during her "attempt to proceed into his house." As is evident by his own testimony, Mr. Hashman first used the knife to cut Ms. Johnson after her entry was complete and enough time had elapsed for her to look within the house for her belongings, yell at him, him to grab her face, her to bite his hand, her to hit him with the knife, and him to obtain possession of the knife from her.[7] Despite

---

7. Mr. Hashman relies in his reply brief upon the formal statement he gave to Detective Smith. This statement contained a somewhat different version of the facts than the story relayed by Mr. Hashman at trial. He cites the formal statement as evidence that Ms. Johnson's second entry into the home was unlawful and not with his permission. The re-entry is assumed to have been unlawful. Viewing the facts in Mr. Hashman's favor, Mr. Hashman said.

I was scared my neighbors was going to hear her, and I didn't want my old lady to know I had her in my home, and I opened the door, and I did grab her. She hit me with her fist. I hit her with my fist, and she pushed me, and I just kind of let her go. I barely hit her with my fist. If she was a guy I would have reacted different, but she was a girl. I didn't really know what to do. I tried to grab her and she got away. She was in my house, and I tried to grab her again, and then I grabbed the knife and I hit her with it.

Mr. Hashman relies on this excerpt as evidence that Ms. Johnson's re-entry was not with his permission. His argument that he cut Ms. Johnson during her re-entry in defense of the premises fails. First, the statement reflects that Ms. Johnson was inside the

Mr. Hashman's many statements to the contrary, the entry was not still in progress; it had been completed and defense of premises was no longer applicable when he used deadly force.

Because the facts, viewed in a light most favorable to Mr. Hashman, indicate that Ms. Johnson's entry was complete at the time he obtained possession of the knife and attempted to use it against her, an instruction for defense of premises was not supported by the evidence. A the time Mr. Hashman picked up the knife and used it against Ms. Johnson, the issue was one of self defense and the jury was properly given a self-defense instruction. The trial court did not abuse its discretion in refusing to tender an instruction for defense of premises.[8]

Point denied.

### Point II

██ In his second point on appeal, Mr. Hashman argues the trial court erred in denying his request for a mistrial or, alternately, failing to specifically instruct the jury on the State's burden of proof after the State instructed the jury to not give him the benefit of the doubt. After all evidence was presented, the parties made their closing arguments. When the assistant prosecutor made the initial argument portion, he referenced the letter Mr. Hashman wrote to Ms. Johnson while Detective Smith was questioning him. This was the letter of apology set forth fully in the facts section. The following exchange occurred:

> [Assistant Prosecutor's Closing Argument]: Members of the jury, lies, lies, lies. What do we know about people who tell lies? They can't be trusted. If you believe what the defendant said today, he's not guilty of anything. He told you up on this stand today for the first time that he's told anyone he was scared for his life. First time he's told anyone. Scared for his life. Lie. What else did he tell you? He told you at every step of the way the victim, Deidra Johnson, just kept attacking him, every step of the way. It was all her. All her. Yet we know one of the things he did say today, which apparently is a truth today, is that the letter he wrote, no one forced him to write this letter he told you today. *And I think anytime during your deliberation when you start to give him any kind of benefit of any kind of doubt, I think you need to pull out this letter and read it.*

> [Defense Counsel]: Judge, may we approach?

> THE COURT: You may.

> (Counsel approached the bench and the following proceedings were had:)

---

house before Mr. Hashman attempted to strike her with the knife. Second, Mr. Hashman relies primarily and extensively upon his testimony at trial. Further, he does not claim that the formal statement and testimony at trial are inconsistent or why one should be deemed more credible. Thus, he must assert that they are consistent. The only logical conclusion is that the testimony at trial was a more elaborated version of the formal statement. Thus, all of the events that occurred between Ms. Johnson's entry and Mr. Hashman obtaining the knife and using it on her, as described in his testimony, are considered the facts most favorable to Mr. Hashman, and a defense of premises instruction was not warranted.

8. Both parties argue regarding whether Mr. Hashman could have reasonably believed Ms. Johnson's entry was for the purpose of committing a burglary, thus justifying the use of deadly force. Because we have concluded that the deadly force was used after the entry was completed and Ms. Johnson was inside the house, we need not consider whether a reasonable person would have determined that her entry was for the purpose of committing a burglary.

[Defense Counsel]: I'm going to object to the argument, Judge. I mean, he's basically instructing them not to follow the law. They're supposed to give him the benefit of the doubt. That's the rule of the law here in Missouri. To tell them every time they think about doing that and consider something else is improper. It is a violation of Mr. Hashman's constitutional right to a fair trial under the Fifth and Sixth amendments of the United States Constitution, and I'd ask for—I'm asking for a mistrial at this point. If the Court's not willing to do a mistrial, at least a curative instruction to let them know the state of the law here in Missouri.

[Assistant Prosecutor]: I can either restate it. Anytime they begin to believe the defendant, I would like you to read this letter. Anytime you begin to believe what the defendant says, I would like you to read this letter.

THE COURT: I'm going to deny your request for mistrial. What kind of curative instruction are you asking for?

[Defense Counsel]: I think that the appropriate thing for the Court to do is to read the instruction that informs them that he's entitled to the benefit of the doubt.

[Prosecutor]: Your Honor, our suggestion, if the Court is going to give any kind of curative instruction, is to say the attorneys are not allowed to instruct on the law. They are only allowed to talk about the instructions, therefore, you are to be guided by the instructions.

[Defense Counsel]: I don't think that's enough.

THE COURT: I think that's adequate because there are several references to it in various instructions. I can't just read one.

[Prosecutor]: [The Assistant Prosecutor] can say that if you give the benefit of the doubt. That's what the instructions tell you, but when you start believing his story, think about various things.

[Defense Counsel]: I'm asking that it still come from the Court.

THE COURT: All right.

(The proceedings returned to open court.)

THE COURT: Ladies and gentlemen, the attorneys are making their argument to you, but I remind you that you are to be guided by the instructions of the Court which are the law in this case. You may proceed.

[Assistant Prosecutor]: Anytime you begin to believe what the defendant told you today—which apparently this letter he now admits he wrote in his own words, no one forced him to do it. No one made him do it. I want to start by talking about credibility and motive to lie . . .

Mr. Hashman claims on appeal that the trial court erred in not granting the requested mistrial or giving the more specific curative instruction. Mr. Hashman's counsel preserved this issue for appellate review by including it as a point in his motion for a new trial.[9]

▮▮▮▮ Misstatements of the law are impermissible during closing arguments and the trial judge has a duty to restrain such arguments. *State v. Collins,* 150 S.W.3d 340, 355 (Mo.App. S.D.2004). "Counsel is permitted a wide latitude in his comments, but he cannot argue beyond the evidence, beyond the issues drawn by the

---

9. The motion for a new trial claimed the trial court erred in denying the request for a mistrial. It did not complain that the curative instructions were not specific enough or satisfactory. Nonetheless, this court will review the issue of whether the curative instructions were satisfactory, *ex gratia.*

instructions, or urge prejudicial matters." *Id.* The comments may not be interpreted in isolation and must be interpreted in the context of the entire record. *Id.* The trial court is in the best position to judge the effect of an argument in light of the overall circumstances. *Hemann v. Camolaur, Inc.,* 127 S.W.3d 706, 711 (Mo.App. W.D. 2004).

 "Reversible error will not exist unless there is both an abuse of discretion by the trial court and prejudice to the defendant as a result of that abuse." *State v. Meder,* 870 S.W.2d 824, 831 (Mo.App. W.D.1993). "To warrant reversal of a conviction for improper closing argument, the defendant must establish that counsel's improper comments had a decisive impact upon the jury's verdict." *Id.* "The appellate court should consider the entire record to determine whether the error was sufficiently prejudicial to have tipped the scales and thereby denied the defendant a fair trial." *Collins,* 150 S.W.3d at 355. A jury is presumed to be aware of and have followed the instructions given by the trial court. *Id.* at 356.

 Declaration of a mistrial is a drastic remedy and the power to declare a mistrial should only be exercised in extraordinary circumstances. *State v. Blakeburn,* 859 S.W.2d 170, 174 (Mo.App. W.D.1993). The trial court is in a better position than an appellate court to determine the prejudicial effect, if any, on the jury of the incident in question. *Id.* "Thus, in determining whether to grant a mistrial, the trial court has broad discretion and will be reversed only for an abuse of that discretion." *Id.*

 If the misstatement was an error of constitutional magnitude, the judgment of guilt can be affirmed only if the error is shown to have been harmless beyond a reasonable doubt. *State v. Driscoll,* 55

S.W.3d 350, 356 (Mo. banc 2001). "As the Supreme Court more recently has instructed, the test for determining whether a constitutional error is harmless ... is whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained, and further, an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *Id.* (quoting *Neder v. United States,* 527 U.S. 1, 15–16, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999))(quote marks omitted).

The prosecuting attorney did not misstate the law. Mr. Hashman asserts that the assistant prosecutor instructed the jury not to give the defendant the benefit of the doubt and objected on that basis. The trial court neither sustained nor overruled the objection. Instead, it denied the request for a mistrial and gave a statement to the jury clarifying that the jury is to follow the law as given to them in the jury instructions. The State's brief does not address the issue of whether the assistant prosecutor misstated the law. Instead, it takes the position that, even if the statement was a misstatement, something it does not concede, it was not prejudicial and was harmless. Given the context of the statement, the assistant prosecutor was not telling the jury that it should not give Mr. Hashman the benefit of reasonable doubt. Instead, the assistant prosecutor told the jury to consider the letter of apology Mr. Hashman wrote when evaluating whether Mr. Hashman's testimony was credible and should be believed. The assistant prosecutor began his argument by indicating Mr. Hashman was a liar. He then went on to note that no one forced Mr. Hashman to write the letter, and the jury should read it when tempted to give him the benefit of the doubt. Once the objection was made, the assistant prosecu-

tor offered to rephrase his statement to express the same sentiment, using different words. The assistant prosecutor offered to re-state the sentiment in such a manner that the jury would be told that any time it starts to believe Mr. Hashman's testimony, it should read the letter, which demonstrates Mr. Hashman's testimony is not credible. The statement made to the jury, although not artfully stated, was not an incorrect statement of the law.

 The State also argues that, even if a misstatement occurred, it was harmless error and did not prejudice Mr. Hashman. "Even if counsel misstated the law rather than clumsily explained it, the misstatement did not harm [the defendant]. When counsel misstates the law, the misstatement is harmless error if the court properly instructs the jury on that point of law or instructs that the attorneys' statements and arguments are not evidence." *Lingar v. Bowersox*, 176 F.3d 453, 460 (8th Cir.1999). The court properly instructed the jury in this case. Also, after the alleged misstatement was made, the trial court informed the jury that it was to follow the instructions, and both the prosecutor and defense counsel explicitly informed the jury that the defendant was entitled to the benefit of the doubt. Defense counsel spoke toward the end of his closing argument about why Mr. Hashman lied to the police initially and stated a black male prowler had broken into his house:

> Then he lies. He's worried. He's been in trouble before. Is he going to get the benefit of the doubt? He doesn't want his girlfriend to know what's been going on. Is he going to get the benefit of the doubt? *Ladies and gentleman, you're required by law to give him the benefit of the doubt.* Nobody else in this situation was. Nobody else in this situation was going to.

The prosecutor argued to the jury that Mr. Hashman's actions were not caused by adequate passion arising out of adequate cause. She stated:

> The testimony supports that didn't happen. Physical evidence. You've got all these pictures. You can take a look at everything. *And yes, you are supposed to give the benefit of the doubt.* That does not mean that you hold him to a lower standard than anybody else. It doesn't mean that you ignore all your common sense and the evidence in the case.

Further, the jury is presumed to have followed the instructions given by the trial court. *Collins*, 150 S.W.3d at 356. The jury was given the MAI–3d 302.03 instruction, which informs the jury that the "law applicable in this case is stated in these instructions." The jury was also given the MAI–3d 302.04 instruction, which states:

> The defendant is presumed to be innocent, unless and until, during your deliberations upon your verdict, you find him guilty. This presumption of innocence places upon the state the burden of proving beyond a reasonable doubt that the defendant is guilty.
>
> A reasonable doubt is a doubt based upon reason and common sense after careful and impartial consideration of all the evidence in the case.
>
> Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. The law does not require proof that overcomes every possible doubt. If, after your consideration of all the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you will find him guilty. If you are not so convinced, you must give him the benefit of the doubt and find him not guilty.

The instructions the jury was given for assault in the first degree, assault in the

second degree, and armed criminal action, each state twice that the jury must find all of the elements to be present beyond a reasonable doubt. Finally, the jury asked the trial court four questions while it was deliberating. None of these dealt with whether Mr. Hashman was entitled to the benefit of the doubt. If the jury was confused regarding that matter, it presumably would have asked. It knew it could ask the trial court questions and did so multiple times regarding other matters.

This was a two day trial comprised of hours of testimony and argument. The alleged misstatement occurred one time, was objected to, the jury was informed it must follow the jury instructions, both the prosecutor and defense counsel explicitly informed the jury that the defendant was entitled to the benefit of the doubt, this sentiment was reiterated in several of the instructions the jury was given, and no evidence demonstrates that the jury was confused. Thus, even if the assistant prosecutor misstated the law, the error was harmless and there was no prejudice to the defendant. *See, e.g., Blakeburn*, 859 S.W.2d at 175 (no reversible error where prosecutor told jury during closing argument defendant not presumed innocent when jury begins deliberations because the comment was an isolated misstatement of the law, the jury was given instructions stating the law accurately, and the prosecutor informed the jury that the defendant was presumed innocent.).

Point denied.

The judgment of convictions is affirmed.

All concur.